In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3425

ILLINOIS BELL TELEPHONE COMPANY, INC.,

*Plaintiff-Appellant,*

*v.*

GLOBAL NAPS ILLINOIS, INC., *et al.,*

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 06 C 3431—**John W. Darrah**, *Judge.*

ARGUED SEPTEMBER 11, 2008—DECIDED DECEMBER 22, 2008

Before EASTERBROOK, *Chief Judge*, and POSNER and
EVANS, *Circuit Judges*.

POSNER, *Circuit Judge*. This appeal in a suit against a
group of affiliated corporations charges that in violation
of the plaintiff's federal tariffs filed with the Federal
Communications Commission, its state tariffs filed with
the Illinois Commerce Commission, and the interconnec-

tion agreement between the plaintiff and one of the affiliates, Global NAPs Illinois, the defendants failed to pay for telecommunications services that the plaintiff had sold to that company.

Questions about our jurisdiction led us to invite supplemental briefs. The plaintiff's points out that a suit to enforce a tariff filed with the FCC is deemed to arise under federal law and is therefore within the federal-question jurisdiction of the district court. *Louisville & Nashville R.R. v. Rice*, 247 U.S. 201, 201-03 (1918); *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533 (1983) (per curiam); *Cahnmann v. Sprint Corp.*, 133 F.3d 484, 488-89 (7th Cir. 1998). It argues that the suit is within the diversity jurisdiction as well because, while Illinois Bell is an Illinois corporation, none of the defendants either is incorporated in Illinois or has its principal place of business there. That the case is within the diversity jurisdiction as well as the federal-question jurisdiction is potentially important because the plaintiff has at least one, and possibly two, claims under state law—one for failure to comply with its state tariffs and the other for violation of the interconnection agreement. Although both are within the supplemental jurisdiction conferred on the federal courts by 28 U.S.C. § 1367, the exercise of that jurisdiction is, as the statute makes clear, discretionary; the exercise of diversity jurisdiction is not.

An exhibit to the plaintiff's supplemental brief contains an admission by Global NAPs Illinois that "to the extent Global [NAPs Illinois] denied [that] it is a Delaware corporation with its principal place of business at 10

Merrymount Road, Quincy, MA that denial was inadvertent and in error." The defendants' supplemental brief says, in a reversal of their previous position, that Global NAPs Illinois "obviously has its principal place of business in Illinois, the only state in which it is licensed and has established interconnection facilities." But its being licensed to do business in Illinois and having "established interconnection facilities" are not evidence that it is a citizen of Illinois. AT&T is licensed to do business in Illinois and has "established interconnection facilities," but is not a citizen of Illinois.

When the facts that determine federal jurisdiction are contested, the plaintiff—or if it is a case that has been removed to federal court, the defendant—must establish those facts by a preponderance of the evidence. *Meridian Security Ins. Co. v. Sadowski*, 441 F.3d 536, 543 (7th Cir. 2006); *Gafford v. General Elec. Co.*, 997 F.2d 150, 159-60 (6th Cir. 1993). Global NAPs Illinois has not mounted a sufficiently colorable challenge to diversity jurisdiction to require the plaintiff to present additional evidence of diversity. Global NAPs Illinois does not have an Illinois corporate charter. Nor is Illinois where it has its principal place of business. It admits that it has no employees other than its corporate officers, and they are all in Massachusetts.

A company's principal place of business is where its "nerve center" is located, or, more concretely, where its executive headquarters are located. *Krueger v. Cartwright*, 996 F.2d 928, 931 (7th Cir. 1993); *Metropolitan Life Ins. Co. v. Estate of Cammon*, 929 F.2d 1220, 1223 (7th Cir. 1991); *Dimmitt & Owens Financial, Inc. v. United States*, 787 F.2d

1186, 1191 (7th Cir. 1986). There are no nerves (in all but the simplest animals) without a brain, and there is no human brain without a human being. An executive headquarters without any executives is similarly oxymoronic. We can imagine an automated company that has no office anywhere but consists of pieces of equipment operated by telecommuting employees scattered across the globe. But what we have in this case is commonplace: a company located in one state (Massachusetts) that has contracts with firms in other states, including Illinois.

"[A] corporation whose center of gravity is in the same state [as the opposing party] even though it may be incorporated elsewhere . . . [is] sufficiently 'local'—sufficiently identified with the state—to avoid the obloquy that may attach to a 'foreign' corporation in litigation with a local resident and that provides the modern rationale of the diversity jurisdiction. The words 'principal place of business' are to be construed with this purpose in mind." *Dimmitt & Owens Financial, Inc. v. United States*, *supra*, 787 F.2d at 1190. There is nothing local about a corporation chartered in another state, managed in another state, administered in another state, headquartered in another state, its local "presence" actually a ghostly absence of living bodies.

But the defendants argue that even if there is prima facie federal jurisdiction, whether based on a federal question or diversity of citizenship, the Telecommunications Act of 1996, 47 U.S.C. §§ 151 *et seq.*, withdraws that jurisdiction from a suit of this kind.

To understand the argument one must understand the two types of charge that one telecommunications carrier can extract from another pursuant to the Telecommunications Act. *Iowa Network Services, Inc. v. Qwest Corp.*, 363 F.3d 683, 686 (8th Cir. 2004). First, an "incumbent local exchange carrier" (a carrier that provided local phone service when the Act was passed, such as Illinois Bell) is required to interconnect on demand with other carriers that provide local telecommunications services within its service area. 47 U.S.C. § 251(c)(2). A carrier demanding interconnection must negotiate with the incumbent local exchange carrier on price and other terms. If the two carriers cannot reach agreement, their disagreement is submitted to what is called "arbitration" but is really the first stage in a regulatory proceeding, as the "arbitration" decision must be submitted to the state regulatory commission for its approval, as must an agreement reached by negotiation. *Id.*, §§ 252(a)(1), (b)(1), (e)(1); *Illinois Bell Tel. Co. v. Box*, No. 08-1489, 2008 WL 5006614, at *1 (7th Cir. Nov. 26, 2008); *Illinois Bell Tel. Co. v. Box*, 526 F.3d 1069, 1070 (7th Cir. 2008).

The interconnection agreement between the plaintiff and Global NAPs Illinois was approved by the Illinois Commerce Commission. A party aggrieved by the state commission's decision, whether imposing or altering the terms of an interconnection agreement, can seek judicial review in federal district court on the ground that the decision violates sections 251 or 252 of the Telecommunications Act. 47 U.S.C. § 252(e)(6). But so far as appears both parties were content with the agreement and neither sought judicial review of the commission's order approving it. Nor did anyone else.

If as in this case the incumbent local exchange carrier sues merely to collect the interconnection charge specified in the approved interconnection agreement, the suit is not based on federal law in any realistic sense, but on a price term in a contract. Just as a suit to enforce a copyright license is held to arise under state rather than federal law even though the grant of a copyright is governed by federal law, *Gaiman v. McFarlane*, 360 F.3d 644, 652 (7th Cir. 2004); *T. B. Harms Co. v. Eliscu*, 339 F.2d 823, 824, 826-27 (2d Cir. 1964) (Friendly, J.), so likewise, while "section 252(c)(6) authorizes a federal court to determine whether the agency's decision departs from federal law," "a decision 'interpreting' an agreement contrary to its terms creates a different kind of problem—one under the law of contracts, and therefore one for which a state forum can supply a remedy." *Illinois Bell Tel. Co. v. Worldcom Technologies, Inc.*, 179 F.3d 566, 574 (7th Cir. 1999); see also *Connect Communications Corp. v. Southwestern Bell Tel., L.P.*, 467 F.3d 703, 708 (8th Cir. 2006); *Southwestern Bell Tel. Co. v. Public Utility Comm'n*, 208 F.3d 475, 484-86 (5th Cir. 2000).

Judge Friendly analogized a suit on a contract by a motor carrier regulated by the Interstate Commerce Commission to a copyright license, in words equally applicable to this case: "That the contracts could not lawfully be carried out save with ICC approval does not, without more, demonstrate that Congress meant all aspects of their performance or non-performance to be governed by law to be fashioned by federal courts rather than by the state law applicable to similar contracts relating to businesses not under federal regulation. This

is not to say that a particular issue concerning such a contract, e.g., whether ICC approval had or had not been granted prior to a particular date, would not require determination under federal principles. But the complaint does not suggest that any such issue is present here." *McFaddin Express, Inc. v. Adley Corp.*, 346 F.2d 424, 426-27 (2d Cir. 1965) (citation omitted); see also *Chicago & North Western Ry. v. Toledo, Peoria & Western R.R.*, 324 F.2d 936, 938-39 (7th Cir. 1963).

We are mindful that *Verizon Maryland, Inc. v. Global NAPs, Inc.*, 377 F.3d 355, 364-65 (4th Cir. 2004), says that interconnection agreements are so important to the federal regulation of telecommunications that suits to enforce them arise under the Telecommunications Act. But that was a very different case from this. Verizon was suing state commissioners to block their order requiring it to pay compensation to another carrier, and while it was doing so in part because it thought they had misinterpreted the interconnection agreement, "according to Verizon's complaint, whether it must pay reciprocal compensation on ISP-bound traffic *under the terms of the agreement* depends in substantial measure upon the requirements of the Act and the FCC's regulations and interpretations. On its face, then, Verizon's contract claim is tied directly to federal law, and its asserted basis in federal law is not 'insubstantial [or] frivolous.'" *Id*. at 363-64 (emphasis in original).

*BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, Inc.*, 317 F.3d 1270, 1278-79 (11th Cir. 2003) (en banc), was a similar case—and the majority

opinion drew a powerful dissent by Judge Tjoflat, see *id*. at 1285-1308—but we need not take sides, as our case is distinguishable. Illinois Bell is seeking merely to collect charges specified in the interconnection agreement.

The second type of charge that one carrier can levy against another is a charge for transmission of a carrier's long-distance telecommunications. Such a charge must be embodied in and collected pursuant to a tariff filed with the Federal Communications Commission. 47 U.S.C. § 203(a). Carriers file similar tariffs with state commissions such as the Illinois Commerce Commission for the transmission of long-distance intrastate communications, and the plaintiff's other state-law claim is based on such a tariff.

The defendants argue that the federal tariff cannot create federal jurisdiction over this suit, as the plaintiff claims it does, because, they say, the interconnection agreement between the plaintiff and Global NAPs Illinois "includes an 'integration clause,' whereby *all* the terms and conditions of the interconnection to which Global was entitled by the [Telecommunications Act] were acknowledged by the parties to be set forth in the [interconnection agreement]. Thus, whatever the parties might owe one another on account of the traffic passing by virtue of their interconnection was plainly acknowledged to be set forth in the [agreement] (and not elsewhere) in compliance with the regime [created by the Act]. Tariff claims presented as 'alternative pleading' do not create federal subject matter jurisdiction."

But the clause is more limited than the defendants claim. It reads: "Entire Agreement. This Reciprocal Com-

pensation Appendix is intended to be read in conjunction with the underlying Interconnection Agreement between ILEC [Illinois Bell, the incumbent local exchange carrier, to which reciprocal compensation is due from competing local exchange carriers that interconnect with it, 47 U.S.C. § 251(b)(5); *In re Core Communications, Inc.*, 455 F.3d 267, 270 (D.C. Cir. 2006)] and CLEC [Global NAPs Illinois, the competitive local exchange carrier], but that as to the Reciprocal Compensation terms and conditions, this Appendix constitutes the entire agreement between the Parties on these issues, and there are no other oral agreements or understandings between them on Reciprocal Compensation that are not incorporated into this Appendix." The "entire agreement" to which the clause refers is thus the reciprocal-compensation appendix, and a number of the plaintiff's claims are unrelated to reciprocal compensation. The duty to provide such compensation is only one of the duties created by the interconnection provisions of the Telecommunications Act. See 47 U.S.C. §§ 251(b)(1)-(4), (c).

We cannot find the "underlying Interconnection Agreement" in the record, but the plaintiff concedes that *some* of the payments that it claims Global NAPs Illinois owes it are based solely on the interconnection agreement, and we have just ruled that a suit for nonpayment in violation of such an agreement does not arise under federal law. And we suppose an integration clause (though not this one, which is narrow in scope) could make *all* claims for payment to a carrier arise under the agreement rather than under filed tariffs. An ordinary agreement couldn't do that—the obligation created by a filed tariff

cannot be altered by an agreement of the parties. *Maislin Industries, Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 126-30 (1990); *Louisville & Nashville R.R. Co. v. Central Iron & Coal Co.*, 265 U.S. 59, 65 (1924). But telecommunications common carriers are authorized to make binding interconnection agreements setting forth the prices of the services agreed upon. 47 U.S.C. § 252(a)(1).

The possibility of turning a federal tariff claim into a simple contract claim does not affect jurisdiction, however. A suit to enforce a federal tariff arises under federal law even if the defendant has a good defense to the claim, such as that the plaintiff had agreed not to make it. That is the implication of the well-pleaded complaint rule. *Caterpillar, Inc. v. Williams*, 482 U.S. 386, 392 (1987). (For its application to a case similar to this, involving one of the defendants in this case, see *Verizon New York Inc. v. Global NAPs, Inc.*, No. 1:03-cv-05073-ENV-RML, at 6-7 (E.D.N.Y. Sept. 20, 2007).) Only if the complaint's invocation of federal law is frivolous does the rule forbid access to federal court under the federal-question jurisdiction. E.g., *Saturday Evening Post Co. v. Rumbleseat Press, Inc.*, 816 F.2d 1191, 1195 (7th Cir. 1987).

The integration clause is a reminder, however, that if an interconnection agreement specifies a particular price for a particular service, the seller cannot, simply by filing a tariff, prevent the buyer from challenging the price in the tariff as discrepant with the price in the interconnection agreement. Global NAPs Illinois argues that the plaintiff's claim is based on a misinterpretation of the agreement. Such a disagreement should normally be

referred to the state regulatory agency, in this case the Illinois Commerce Commission, before the federal court decides the case. The agency had to approve the parties' agreement and had the authority to impose a different agreement on them, or, what amounts to the same thing, to modify the agreement they had negotiated. 47 U.S.C. § 252(e)(1), (2). If a dispute over the meaning of the agreement arises, the agency will usually be in the best position to resolve it.

True, the Telecommunications Act does not expressly authorize a state commission, after it approves an interconnection agreement, to resolve disputes arising under it. Nor does the Act expressly authorize a federal court to refer such a dispute, if the dispute arises in a suit in federal court, to the state commission, either. But such authority is a sensible corollary to the allocation of state and federal responsibilities made by the Act. *Core Communications, Inc. v. Verizon Pennsylvania, Inc.*, 493 F.3d 333, 344 (3d Cir. 2007); *BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Services, Inc.*, *supra*, 317 F.3d at 1276-77; cf. Peter W. Huber, Michael K. Kellogg & John Thorne, *Federal Telecommunications Law* § 3.3.4, pp. 226-28 (2d ed. 1999) (the Telecommunications Act of 1996 "directly controls intrastate issues that were once the exclusive province of the states. To that extent, the Act federalizes these local interconnection issues. But the respective roles of the state and federal agencies in implementing these market-opening provisions have been a matter of considerable dispute . . . . As a backstop to its primary reliance on privately negotiated agreements . . . Congress enlisted the aid of state public

utility commissions to ensure that local competition was implemented fairly and with due regard to the local conditions and the particular historical circumstances of local regulation under the prior regime"); Leon T. Knauer, Ronald K. Machtley & Thomas M. Lynch, *Telecommunications Act Handbook* 127-31 (1996).

Regulatory agencies don't usually engage in contract interpretation. But since interconnection agreements are complex and have to be approved by a state commission and disputes over their meaning are very likely to present issues related to the commission's federal statutory authority—for example whether the contractual interpretation urged by one of the parties would result in price discrimination, 47 U.S.C. § 252(d)(1)(A)(ii)—the referral of interpretive disputes to the state commission, unless they seem contrived or are otherwise easy to resolve, is a sensible procedure; and there is nothing in the Telecommunications Act to forbid it. And if this is right, then a carrier seeking to enforce an interconnection agreement must not be permitted to prevent referral by filing a tariff and suing to enforce it rather than the interconnection agreement. *U.S. West Communications, Inc., v. Hix*, 183 F. Supp. 2d 1249, 1266 (D. Colo. 2000); see *Global NAPs, Inc. v. FCC*, 247 F.3d 252, 255-56 (D.C. Cir. 2001).

To give the referral procedure a label, we are saying that issues that arise in the course of a federal suit to enforce an interconnection agreement may sometimes be within the "primary jurisdiction" of the state regulatory agency. As explained in *United States v. Western Pacific Ry.*, 352 U.S. 59, 63-64 (1956), "the doctrine of primary jurisdiction, like the rule requiring exhaustion of

administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties . . . . 'Primary jurisdiction' . . . applies where a claim is originally cognizable in the courts, and comes into play whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." See also *City of Peoria v. General Electric Cablevision Corp.*, 690 F.2d 116, 120-21 (7th Cir. 1982). Although the role assigned by the Telecommunications Act to the state commission in approving, rejecting, or imposing agreements is largely limited to assuring that they are "nondiscriminatory" and serve the "public interest, convenience and necessity," 47 U.S.C. §§ 252(d)(1)(A)(ii), (e)(2)(A), these are broad criteria that create regulatory discretion based on familiarity with a technical field. See also Illinois Public Utilities Act, 220 ILCS 5/9-250, 5/10-108. A federal court can properly stay its proceedings to allow the state commission to interpret the terms of an interconnection agreement to assure compliance with the statutory criteria before the court addresses other aspects of the suit, including (as in this case) federal tariff and veil-piercing claims.

Primary jurisdiction usually involves referral to a federal agency, but in a case such as this, in which a state commission is exercising in effect delegated federal power, the logic of the doctrine permits a federal court's reference to a state agency. Cf. *Kendra Oil & Gas, Inc. v.*

*Homco, Ltd*., 879 F.2d 240, 242 (7th Cir. 1989). An alternative approach—the doctrine of *Burford v. Sun Oil Co.,* 319 U.S. 315 (1943), which requires federal district courts to decline to exercise federal jurisdiction over certain types of cases confided by state law to state administrative agencies—does not fit this case. The reason is not the uncertainty about whether the state commission can resolve the entire dispute over nonpayment of the plaintiff's interconnection charges, even though, if not, the proper disposition is a stay of the court case rather than—what is the normal result of *Burford* abstention—its dismissal. *Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 302 (3d Cir. 2004). For in a damages suit, a stay might be an appropriate means of effectuating *Burford* abstention, as explained in *Front Royal & Warren County Industrial Park Corp. v. Town of Front Royal*, 135 F.3d 275, 282-83 (4th Cir. 1998). The critical point, rather, is that *Burford* is limited to cases in which "adjudication in federal court would 'unduly intrude into the processes of state government or undermine the State's ability to maintain desired uniformity,'" or invade "the State's interests in maintaining 'uniformity in the treatment of an essentially local problem' . . . and [in] retaining local control over 'difficult questions of state law bearing on policy problems of substantial public import.'" *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 728 (1996) (citations omitted); see also *Behavioral Institute of Indiana, LLC v. Hobart City of Common Council*, 406 F.3d 926, 931 (7th Cir. 2005).

The regulatory issues that arise in cases governed by the Telecommunications Act are not "local" in the *Burford* sense. The role that the Act carves out for the states is

that of ancillary enforcers of the comprehensive scheme of federal telecommunications regulation set forth in the Act. The state commissions are not enforcing policies central to state government when they are regulating telecommunications; in that role they are "'deputized' federal regulator[s]" of the Telecommunications Act. *MCI Telecommunications Corp. v. Illinois Bell Tel. Co.*, 222 F.3d 323, 344 (7th Cir. 2000).

Despite the term primary *jurisdiction*, the reference of a case to an agency pursuant to that doctrine, rather than denying the jurisdiction of the court over the case, presupposes that jurisdiction. See, e.g., *United States v. Western Pacific Ry.*, *supra*, 352 U.S. at 63-64; *Baker v. IBP, Inc.*, 357 F.3d 685, 692 (7th Cir. 2004); *Clark v. Time Warner Cable*, 523 F.3d 1110, 1114-15 (9th Cir. 2008). If the court lacked jurisdiction it would have to dismiss the suit, not stay it in anticipation of its eventual resumption after the agency rules. As explained in *Arsberry v. Illinois*, 244 F.3d 558, 563-64 (7th Cir. 2001) (citations omitted), we are at the heart of the doctrine of primary jurisdiction when "in a suit involving a regulated firm but not brought under the regulatory statute itself, an issue arises that is within the exclusive original jurisdiction of the regulatory agency to resolve, although the agency's resolution of it will usually be subject to judicial review. When such an issue arises, the suit must stop and the issue must be referred to the agency for resolution. If the agency's resolution of the issue does not dispose of the entire case, the case can resume, subject to judicial review of that resolution along whatever path governs review of the agency's decisions, whether back to

the court in which the original case is pending or, if the statute governing review of the agency's decisions designates another court, to that court." Despite the reference in this passage to the "*exclusive* original jurisdiction of the regulatory agency," as we said earlier we do not think the court need refer all disputes over an interconnection agreement to the state commission, only those where the dispute raises a genuine policy issue the resolution of which has been confided by the Telecommunications Act to the state commissions.

For completeness we note that in the absence of diversity or federal-question jurisdiction, a suit to enforce an interconnection agreement would have to be brought in state court, though if in the course of the litigation a question within the primary jurisdiction of the state commission arose the question would have to be referred to the commission.

The defendants do raise issues concerning the meaning of the interconnection agreement, as we said, but it would be premature at this juncture to refer any of those issues to the Illinois Commerce Commission. The only issue addressed thus far in this litigation (apart from subject-matter jurisdiction) is whether the district court has personal jurisdiction over six affiliates of Global NAPs Illinois on a theory of "piercing the corporate veil." To ask the Illinois Commerce Commission to opine on that topic would be to ask it to rule on an issue unrelated to its regulatory responsibilities. It is a threshold issue because unless it is resolved in Illinois Bell's favor this suit is academic—Global NAPs Illinois has no assets out of which

to pay a judgment. The issue of piercing the corporate veil has to be resolved before there is any referral to the state commission. The district court therefore properly addressed the issue and we have now to determine whether the court resolved it correctly.

Ferrous Miner Holdings is the parent of Global NAPs Illinois and the other defendants. The district court dismissed it as not being within the court's personal jurisdiction. The judge entered that dismissal as a final judgment under Rule 54(b), finding no reason to delay the entry of an appealable order letting Ferrous Miner out of the case.

The plaintiff argues that the district judge was not authorized to issue a Rule 54(b) judgment because the question of personal jurisdiction over Ferrous Miner is entwined with questions involving other defendants, such as whether the doctrine of piercing the corporate veil can be used by the plaintiff to fix liability on other affiliates of Global NAPs Illinois, four of which (all but Ferrous Miner) remain defendants in the district court.

The argument is frivolous. The rule provides that "when an action presents more than one claim for relief . . . or when multiple parties are involved, the court may [provided there is no just reason for delay] direct entry of a final judgment as to one or more, but fewer than all, of the claims or parties." Multiple claims *or* multiple parties. If there is one claim but multiple parties, the court can enter judgment as to one or more of the parties, releasing them from the threat of liability. E.g., *United*

*States v. Ettrick Wood Products, Inc.*, 916 F.2d 1211, 1217-19 (7th Cir. 1990).

That the plaintiff should be seeking in this appeal to change the judgment into a mere interlocutory ruling by the district judge that the plaintiff cannot bring Ferrous Miner into the case (a ruling without res judicata effect until a final judgment is entered) is defeatist, and surprises us, as the merits of the appeal—which fortunately for the plaintiff it has also argued—are compelling. Ferrous Miner is the sole stockholder of Global NAPs Illinois, which has no assets other than its Illinois certificate of convenience and necessity, no revenues, no income, no financial statements, no payroll accounts, and no employees besides its three officers.

The district judge seems to have thought that a court in Illinois could obtain jurisdiction over Ferrous Miner only if there was a basis for piercing Ferrous Miner's corporate veil. But the plaintiff is not trying to obtain relief against Frank Gangi, the owner of Ferrous Miner. The veil it wishes to pierce is that of Ferrous Miner's subsidiary—the corporate limited liability of Global NAPs Illinois—so that it can get at the parent company. *United States v. Bestfoods*, 524 U.S. 51, 61-64 (1998); *Papa v. Katy Industries, Inc.*, 166 F.3d 937, 940-41 (7th Cir. 1999); *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 630-31 (7th Cir. 2002). That corporation is a shell. For aught that appears, the only reason for its existence is that Ferrous Miner does not want to pay for the communications services that it bought from the plaintiff in the name of the shell. Richard Gangi, the treasurer of Global NAPs Illinois, has acknowledged that Ferrous Miner's

subsidiaries are "file companies" that "don't do anything." "They have no assets. They have no employees." Frank Gangi similarly described what he calls "regulatory" corporations as ones that exist "for the purpose of serving a regulatory requirement." It "may have no assets, it may have no income, it may have no expenses. It may be just what we call a file drawer company." The corporate structure that the Gangi brothers have created appears to be designed to keep all its assets in corporations that have no liabilities and all its liabilities in corporations that have no assets.

Ferrous Miner argues that the law applicable to piercing the corporate veil in this case is Delaware law, and that under Delaware law the veil can be pierced only upon a showing of fraud. That is not true, as it would enable companies to insulate themselves from tort liability by operating through shell corporations. For if you are a bystander injured by a truck driven by the employee of a corporation that has no assets, you cannot cry "fraud"—the corporation had made no representations to you.

What is true is that in a contractual veil-piercing case, such as this case, Delaware permits piercing the veil only upon proof either of fraud or that the corporation simply functioned as a façade for the dominant share-holder. See Stephen B. Presser, *Piercing the Corporate Veil* § 2:8 (2008). These are closely related criteria. See *Trustees of National Elevator Industry Pension, Health Benefit & Educational Funds v. Lutyk*, 332 F.3d 188, 193-94 (3d Cir. 2003); *Southeast Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 674-75 (6th Cir. 2006), citing *Wallace v.*

*Wood*, 752 A.2d 1175, 1184 (Del. Ch. 1999). If there is no substance at all to a corporation, so that it cannot be made to answer for any of its debts, no rational person would make a contract with it unless he were deceived. "Suppose a controlling shareholder [Ferrous Miner] . . . persuades a lender to extend credit on favorable terms to the shareholder's corporation [Global NAPs Illinois] by representing that the corporation has substantial net assets, but in fact it is a shell, and all the assets ostensibly owned by the corporation are actually owned by the shareholder. The corporation defaults, and when the lender tries to sue the share-holder to collect his loan—for the corporation has no assets out of which to collect it—he is met by the defense of limited liability. This is the paradigmatic case for rejecting the defense." *In re Kaiser*, 791 F.2d 73, 75 (7th Cir. 1986); see also *Browning-Ferris Industries of Illinois, Inc. v. Ter Maat*, 195 F.3d 953, 959-60 (7th Cir. 1999). Had Global NAPs Illinois during its negotiations with the plaintiff said that in the event it broke its contract the plaintiff could forget about suing, because it is a shell, the plaintiff would not have signed the contract without a guaranty by Ferrous Miner. It is hard to imagine why, except to commit such a fraud, a businessman would create shell corporations other than for tax or regulatory reasons, which would not justify using the shell to strip unknowing contracting parties of all remedies for breach of contract.

Not that the plaintiff has yet *proved* fraud, or even that Global NAPs Illinois is just a shell; the only question at this stage is whether the plaintiff produced enough evidence to bring Ferrous Miner within the personal

jurisdiction of the district court, a preliminary issue to be resolved summarily by the judge. The plaintiff has produced more than enough evidence. *Phillips v. Prairie Eye Center*, 530 F.3d 22, 26 (1st Cir. 2008); see also *Central States, Southeast & Southwest Areas Pension Fund v. Phencorp Reinsurance Co.*, 440 F.3d 870, 877-78 (7th Cir. 2006); *Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 675-77 (7th Cir. 2001).

Since we are not ruling that the plaintiff can pierce Global NAPs Illinois's corporate veil—only that there is enough evidence to enable the company's owner, Ferrous Miner, to be brought within the personal jurisdiction of the district court—we should consider, in order to provide some guidance to the district court on remand, the plaintiff's argument that a federal common law of veil piercing, less demanding than the Delaware standard, should apply instead of that standard. The plaintiff is correct that a state's restrictive law of veil piercing is not allowed to undermine the effectiveness of a federal statute that provides remedies for persons who may find it impossible to vindicate their federal rights if opposed by such a law. "[T]he policy underlying a federal statute may not be defeated by such an assertion of state power," *Anderson v. Abbott*, 321 U.S. 349, 365 (1944); see also *United States v. Bestfoods*, *supra*; *First National City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 629 (1983); *Brotherhood of Locomotive Engineers v. Springfield Terminal Ry.*, 210 F.3d 18, 25-30 (1st Cir. 2000); *Lowen v. Tower Asset Management, Inc.*, 829 F.2d 1209, 1220 (2d Cir. 1987).

But we doubt that there will be any need in this case to depart from the Delaware standard. A person who deals with a corporation knowing that it is radically undercapitalized or otherwise unusually difficult to obtain a collectible judgment against in the event of a breach of contract either has only himself to blame or was compensated by the other party for the increased risk that its capital structure placed on him. *Browning-Ferris Industries of Illinois, Inc. v. Ter Maat*, *supra*, 195 F.3d at 960. (There is no suggestion that as a common carrier the plaintiff was obligated to sell to a firm that could not pay for the service it was buying.) The plaintiff argues that it was misled by the shell's appearing to be a real firm. If that is right it is entitled to pierce the corporate veil, *id.* at 959-60; *In re Kaiser*, *supra*, 791 F.2d at 76; *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 447 F.3d 411, 416-17 (5th Cir. 2006); *Torco Oil Co. v. Innovative Thermal Corp.*, 763 F. Supp. 1445, 1450-51 (N.D. Ill. 1991), and if not, not.

Ferrous Miner is within the district court's personal jurisdiction. The judgment dismissing it is therefore reversed.