In the

# United States Court of Appeals
## For the Seventh Circuit

No. 15-1004

UNITED STATES OF AMERICA *ex rel*. SHEET METAL WORKERS
INTERNATIONAL ASSOCIATION, LOCAL UNION 20,

*Plaintiff-Appellant*,

*v.*

HORNING INVESTMENTS, LLC,

*Defendant-Appellee*.

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 12-cv-00830 — **Jane E. Magnus-Stinson**, *Judge*.

ARGUED NOVEMBER 6, 2015 — DECIDED JULY 7, 2016

Before WOOD, *Chief Judge*, and POSNER and EASTERBROOK,
*Circuit Judges*.

WOOD, *Chief Judge*. Horning Investments, LLC, is a roofing
company, but this case is about a floor—in particular, the
lower limit on wages and benefits imposed by the federal Da-
vis-Bacon Act. The dispute concerns a construction project for
the U.S. Department of Veterans Affairs. Horning was a sub-
contractor for the project; its workers are represented by Local

20 of the Sheet Metal Workers International Association (the Union). Believing that Horning had paid its workers less than the Davis-Bacon Act requires, the Union sued. Interestingly, however, it did not pursue relief directly under Davis-Bacon; instead, it filed a *qui tam* action under the False Claims Act, 31 U.S.C. §§ 3729–3733—the statute at issue in the Supreme Court's recent decision in *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016).

By choosing the False Claims route, the Union undertook to show that Horning knowingly made false statements (or misleading omissions of the type described in *Universal Health Services*) that were material to the government's payment decision. We conclude that the Union did not proffer enough evidence to permit a reasonable jury to conclude that Horning acted with the requisite knowledge. We thus affirm the judgment of the district court in Horning's favor.

**I**

Horning Investments does business as Horning Roofing & Sheet Metal, LLC; we refer to both entities as Horning. In May 2011, a company called Construct Solutions won the contract to perform work at the Veterans Affairs Medical Center in Dayton, Ohio. Construct Solutions awarded Horning the subcontract to provide roofing for the Medical Center. As all concede, the Davis-Bacon Act, 40 U.S.C. §§ 3141–43, applied to this project.

That Act requires contractors who perform construction projects for the federal government to pay their workers the "prevailing wage." *Id.* § 3142(a). Regulations issued by the Department of Labor define that term by region; the definition outlines base wage rates and fringe benefits for each type of

worker. *Id.* § 3142(b). The parties have stipulated that in Dayton, Ohio, at the time the Medical Center was being built, the base rate for a worker classified as a Sheet Metal Worker was $26.41 per hour, and the additional fringe benefit rate was another $16.82 an hour. The parties also agree that the workers were classified in the proper category and that they were paid the appropriate base rate. This case is about their fringe benefits.

Horning provides certain fringe benefits to all of its employees, both those who work on projects covered by Davis-Bacon and those who work on other projects. For example, employees who have worked at Horning for more than 90 days are eligible for life, dental, vision, and health insurance; some also receive vacation days. After a year, they become eligible for matching contributions to a 401(k) account. In October 2010, Horning created a Trust for its employee insurance benefits. (It already had a separate fund for the 401(k) accounts.) Robin Moore, who handled Horning's human resources portfolio, testified that she relied on advice from Horning's accountants to determine how much to deduct from paychecks and how to allocate those funds between the 401(k) account and the new Trust. The accountants advised Horning about how much it needed to deposit into the Trust in order to comply with applicable law, including both the Employment Retirement Income Security Act of 1974 (which is not at issue here) and the Davis-Bacon Act.

Horning ran into trouble when it decided to deduct a flat hourly fee, to be paid into the Trust, from the paycheck of each employee working on the Medical Center project. Moore testified that, based on a "rounded figure" she received from the accountants, she deducted $5.00 per hour from those

paychecks and deposited those funds into the Trust. That amount was deducted regardless of whether the employee was eligible for any benefits at all (for instance, without differentiating between those employed for more than 90 days and new hires). Furthermore, the $5.00 did not correspond to the actual monetary value of the benefits each individual employee received. It is this arrangement, according to the Union, that violates Davis-Bacon.[1]

In order fully to understand the Union's theory, we must delve into the details of Horning's system for paying benefits. First, Moore calculated the paycheck deduction for each employee. Then Leanne Torres, the person directly responsible for payroll, passed along information about each employee's paycheck, including total amount, deductions, and contributions to the Trust and the 401(k) account, to Horning's external payroll processor, Paychex. Paychex deposited money into the appropriate accounts and generated a form, known as the Certified Payroll Report (or Register), memorializing the payments. Torres reviewed the Certified Payroll Report and submitted it to Construct Solutions, which in turn submitted the Report to the government for payment.

Initially, the Certified Payroll Report listed the higher, total amount, before deductions for payments to the Trust and the 401(k) account were made, as the "wage" paid to each employee. It incorrectly indicated that amounts paid into the Trust and the 401(k) accounts were in *addition* to the listed

---

[1] The record does not indicate where, exactly, the $5.00/hour number came from, but both parties say that it was deducted from the fringe rate and that the rest of the fringe rate went into the employee's 401(k) account. The Union has made nothing of this loose end, and so neither will we.

number rather than included within it. Torres eventually corrected the Certified Payroll Reports. The Union contends, however, that this was not enough, because its employees were still not receiving the proper Davis-Bacon pay rates. Each Certified Payroll Report included a statement attesting that it was accurate, that no further deductions were taken, and that fringe benefits were properly paid.

In addition to the Certified Payroll Reports that it submitted to the government, Horning also prepared eight specific applications for payment and sent them to Construct Solutions. Construct Solutions later forwarded these to the government. Like the Certified Payroll Reports, the applications included a statement attesting that Horning was paying Davis-Bacon rates to its employees.

The Union brought this action, in which it alleges that Horning's Certified Payroll Reports and the eight applications for payment (along with the certifications of Davis-Bacon compliance appearing in both types of documents), violated the False Claims Act. That Act provides a damages remedy against any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment." 31 U.S.C. § 3729(a)(1)(A). It permits a private party, known as a relator, to sue on behalf of the United States in specified circumstances. *Id.* § 3730(b). The Union is seeking to take advantage of that provision. It argues that Horning, through the actions of Moore and Torres, "knowingly … cause[d] to be presented [] a false or fraudulent claim for payment." *Id.* § 3729(a)(1)(A). After discovery, the parties filed cross-motions for summary judgment. Finding that Horning had relied on the advice of its accountants and thus did not have the requisite knowledge

that its statements were false, the district court granted Horning's motion. The Union appeals.

## II

### A

Before we may turn to the merits of this appeal, we must assure ourselves that the district court's jurisdiction was secure. On the surface, this seems clear: the Union's claims rest on the False Claims Act, which indicates that federal-question jurisdiction exists under 28 U.S.C. § 1331. Horning resists this simple conclusion, however, for two reasons: first, it contends that the Union is not the original source of the information on which the suit is based and thus is not entitled to act as a relator (*i.e.* as the one asserting the interests of the United States in not paying false claims); second, it argues that the Department of Labor has "primary jurisdiction" here, and that its authority ousts the district court's power to adjudicate the case. We find no merit in either of these contentions.

It is true that claims that previously have been disclosed may be brought only in limited circumstances, see 31 U.S.C. § 3730(e)(4), and that this rule is jurisdictional, see *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 467 (2007). But both sides acknowledge that the Union's allegations had not been "publicly disclosed" before this suit was filed. Section 3730(e)(4) thus does not apply, and it makes no difference whether the Union was an original source. See *Glaser v. Wound Care Consultants, Inc.*, 570 F.3d 907, 913 (7th Cir. 2009) (recognizing that section 3730(e)(4) applies only to "publicly disclosed" allegations). That disposes of Horning's first objection.

Its second one is equally unavailing. Despite the label, the doctrine of "primary jurisdiction" is not jurisdictional in the sense that matters here. *Illinois Bell Tel. Co. v. Global NAPs Illinois, Inc.*, 551 F.3d 587, 595 (7th Cir. 2008); *cf. Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1387–88 & n.4 (2014) (emphasizing that few doctrines are truly "jurisdictional"). "Primary jurisdiction" is a permissive doctrine that applies when resolving a claim "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body." *United States v. Western Pac. Ry. Co.*, 352 U.S. 59, 63–64 (1956). In such cases, a federal court may stay the proceeding to allow the agency to take the first look at the case. *Illinois Bell Tel. Co.*, 551 F.3d at 595.

There is no need here to defer to the Department of Labor. Although it has special expertise in classifying employees for Davis-Bacon purposes, this case does not present a classification dispute. As the Sixth Circuit put it, when the "core dispute … involves misrepresentation, not misclassification," primary jurisdiction does not prevent a federal court from hearing a False Claims Act case that rests on alleged Davis-Bacon violations. *United States ex rel. Wall v. Circle C Const., LLC*, 697 F.3d 345, 354 (6th Cir. 2012). That perfectly describes our case, and so we proceed to the merits.

B

To defeat the district court's grant of summary judgment in Horning's favor, the Union must be able to point to evidence from which a reasonable jury could conclude "(1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *Thulin v.*

*Shopko Stores Operating Co., LLC*, 771 F.3d 994, 998 (7th Cir. 2014); see also *Universal Health Servs.*, 136 S. Ct. at 1996.

The Union has presented more than enough to satisfy the first element. Horning's employee, Torres, made statements to the government in order to receive money for Horning from it. She submitted the Certified Payroll Reports and the eight applications that initially went to Construct Solutions with the knowledge that they were to be presented to the Department of Veterans Affairs for payment. See *United States ex rel. Garbe v. Kmart Corp.*, No. 15-1502, 2016 WL 3031099, at *4 (7th Cir. May 27, 2016) (False Claims Act liability can attach to any claim that eventually is submitted to the government, even if it goes through an intermediary).

The second element, which may well be affected by *Universal Health Services*, is less certain. It is not clear whether this is the kind of "implied false certification" that the Court discussed in its opinion, but it seems that it may be, in the absence of an affirmative lie. The Court held that "liability can attach when the defendant submits a claim for payment that makes specific representations about the goods or services provided, but knowingly fails to disclose the defendant's non-compliance with a statutory, regulatory, or contractual requirement. In these circumstances, liability may attach if the omission renders those representations misleading." *Universal Health Servs.*, 136 S. Ct. at 1995. We see no need, however, to solicit briefing on the effect of *Universal Health Services*, because it is possible to resolve this case on the basis of the final element: whether any misrepresentations Horning made were "knowing."

While the statute does not require a specific intent to defraud, it does state that the defendant must "have acted with

'actual knowledge,' or with 'deliberate ignorance' or 'reckless disregard' to the possibility that the submitted claim was false." *United States v. King-Vassel*, 728 F.3d 707, 712 (7th Cir. 2013) (quoting 31 U.S.C. § 3729(a)(1)(A), (B)) (emphasis omitted). "Innocent mistakes or negligence are not actionable." *Hindo v. Univ. of Health Sciences/The Chicago Med. Sch.*, 65 F.3d 608, 613 (7th Cir. 1995). In the FCA context, the reckless disregard required to show the necessary knowledge is "an extension of gross negligence." *King-Vassel*, 728 F.3d at 712 (internal quotation marks omitted) (quoting *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997)); *cf. Universal Health Servs.*, 136 S. Ct. at 2003–04 (stressing the importance of the False Claims Act's scienter requirement and the demanding standard for proving materiality).

The Union has not met that standard. It argues that because all employees who worked on the project had $5.00 per hour deducted from their paychecks, and at least some of the employees had not worked for Horning long enough to receive benefits, then Horning must have known that it was not giving each employee the full value of the $5.00 deducted. The Union further urges that not all employees received the full value of their fringe benefits because the Trust covered expensive medical treatments for some and nothing for others. In other words, it says, because Horning never tried to determine whether each employee received the equivalent of $5.00 per hour in medical, dental, vision, or life insurance, Horning acted with reckless disregard with respect to its handling of fringe benefits.

The fallacy in the Union's argument lies in its failure to distinguish between payments for these insurance-like benefits and payment of later claims submitted. The value of

health insurance, for example, is not computed by asking how much medical care a person consumed; it is how much the person pays each month to purchase the desired policy. Horning was under no obligation to track down each employee to see if his or her claims worked out to $5.00 times the number of hours worked over a relevant period. Certainly nothing in the Davis-Bacon Act requires this unusual approach. The Act defines "prevailing wages" to include fringe benefits, and it defines those benefits as including payment

> for medical or hospital care, pensions on retirement or death, compensation for injuries or illness resulting from occupational activity, or insurance to provide any of the forgoing … for vacation and holiday pay … or for other bona fide fringe benefits … the amount of—
>
> > (i) the rate of contribution irrevocably made by a contractor or subcontractor to a trustee … under a fund …; and
> >
> > (ii) the rate of costs to the contractor … that may be reasonably anticipated in providing benefits … pursuant to an enforceable commitment to carry out a financially responsible plan[.]

40 U.S.C. § 3141(2). This passage does not suggest that the value paid out from a fund is the proper measure of the value of a benefit. Nor do the regulations from the Department of Labor take this position. To the contrary, the Act and the regulations state that the employer's *contribution* to a "conventional plan" for fringe benefits can count toward the fringe benefit rate. *Id.* § 3141(2)(B)(i); 29 C.F.R. § 5.29(d) ("Contractors may take credit for contributions made under such con-

ventional plans without requesting the approval of the Secretary of Labor[.]"). Since the Davis-Bacon Act does not require Horning to compute the value of benefits in the odd manner called for by the Union, the fact that Torres and Moore failed to do so tells us nothing about whether they knew that their certifications of Horning's compliance with the Act were false.

The fact that some of the employees from whose checks the $5.00 deductions were made were not yet eligible to receive fringe benefits does not matter either. The Department of Labor has stated that the Davis-Bacon Act permits an employer to count contributions to an insurance plan for employees who are not yet eligible for coverage when the plan itself requires the employer to make that contribution during the waiting period. See Dep't of Labor, Field Operations Handbook, § 15f13, *available at* https://www.dol.gov/whd/foh /foh_ch15.pdf (last visited June 18, 2016); *William J. Lang Land Clearing, Inc. v. Admin.*, 520 F. Supp.2d 870, 885 (E.D. Mich. 2007). The Department of Labor does not tell us whether section 15f13 applies to contributions to a trust rather than a plan. Nor does the record tell us whether Horning was contractually obligated to make contributions to the Trust during the 90-day waiting period for new employees. We thus neither can nor do decide whether Horning violated the Davis-Bacon Act by deducting Trust contributions from the paychecks of employees whose rights to fringe benefits had not yet vested. All that is relevant for present purposes is that there is enough ambiguity about this matter that we cannot infer that Horning either knew or must have known that it was violating the Davis-Bacon Act.

## C

We conclude with a few words about Horning's asserted reliance on its accountants. The district court decided, and Horning has argued on appeal, that this fact alone is enough to negate its knowledge. We do not agree with that flat statement, and as we have shown above, our decision rests on the full record that was made on summary judgment.

In some situations, reliance on the advice of a professional, such as an attorney or an accountant, "can negate the mental state required for some crimes." *United States v. Roti*, 484 F.3d 934, 935 (7th Cir. 2007); see also *United States v. Boyle*, 469 U.S. 241, 250 (1985) (recognizing that a taxpayer who "relie[s] on the erroneous advice" of counsel, an accountant, or a tax adviser, may have "reasonable cause" for failing to file a return); *United States v. Urfer*, 287 F.3d 663, 665–66 (7th Cir. 2002) ("the fact that he was acting on the advice of counsel … bears on whether he knew that he was violating the statute"). A defendant may not rely on this type of advice, however, unless she establishes that (1) before taking action (2) she "in good faith sought the advice of [the professional] whom [she] considered competent," (3) about the lawfulness of her future conduct, (4) she made a "full and accurate report" of all relevant facts to the professional, and (5) she acted in strict accordance with the advice. *United States v. Cheek*, 3 F.3d 1057, 1061 (7th Cir. 1993) (on remand from Supreme Court, internal quotation marks omitted) (quoting *Liss v. United States*, 915 F.2d 287, 291 (7th Cir. 1990)).

Horning did not develop the facts that were needed to provide a basis for an "advice-of-accountant" defense. We do not know precisely what it told its accountants, whether they

provided all necessary details, or what exactly the accountants recommended. We therefore cannot say whether any reliance that followed was reasonable and thus sufficient to negate any inference that Horning knew that its statements were false, and for that reason we place no weight on this point.

### III

Horning may, or may not, have violated the Davis-Bacon Act. But the Union did not bring a claim under that statute. Instead, it sued under the False Claims Act, which requires proof that the defendant *knowingly* submitted a false claim to the government for payment. The Union did not present enough evidence to survive summary judgment on that issue, and so we AFFIRM the judgment of the district court.

POSNER, *Circuit Judge*, dissenting. For Horning, the employer defendant, to be found to have violated the False Claims Act, the union had to prove that the company had "knowingly present[ed], or cause[d] to be presented [to the government], a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A). The employer does not have to have *intended* to defraud (i.e., cheat) the government. § (b)(1)(B). It just has to have known that the claim it's submitting is false, or act in reckless disregard of its truth or falsity. § (b)(1)(A). It might think the falsehood harmless—it might for example be sure the claim would be turned down—or it might think it had underclaimed in the past, and the false claim if accepted would merely place it in the position it would be in, rightfully, had it not made such mistakes. But as long as the claimant knows that its representations are both false and "material" (i.e., relevant in the sense of "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property" by the government, § (b)(4)), it has violated the False Claims Act. *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016).

By way of background it needs to be understood that a separate statute, the Davis-Bacon Act, establishes a minimum wage for workers on certain federal construction projects, 40 U.S.C. § 3142, among them a project in Dayton, Ohio, for which Horning was a contractor. That minimum (which is based on the prevailing wage for similar work in the location in which the work will be performed, § 3142(b)) includes fringe benefits. § 3141(2). For example, Horning was required to pay roofers a wage of $22.36 an hour plus $11.58 an hour in fringe benefits, for a total of $33.94 an hour. The fringe benefits included insurance: $5 of the $11.58

was not paid to the employees but instead was to be used to fund an insurance program for them ("the trust").

The false-claims evidence begins with the false statement, in the Certified Payroll Reports that Horning submitted to the Department of Veterans Affairs, that "all persons employed on [the] project have been paid the full weekly wages earned … and no deductions have been made either directly or indirectly from the full wages earned by any person, other than permissible deductions." An employee named Federico Gonzalez had $5 per hour deducted from his pay and placed into the fringe-benefits trust even though he was ineligible to receive benefits from the trust. The Davis-Bacon Act permits an employer to count contributions to an insurance plan for employees not yet eligible for coverage only if the plan requires the employer to make those contributions during the employee's waiting period—that is, after the employee has been hired but before he is eligible for benefits. See Dep't of Labor, *Field Operations Handbook* § 15f13, www.dol.gov/whd/foh/foh_ch15.pdf (visited July 7, 2016). Horning had contributed $5 per hour to the insurance trust ostensibly for Gonzalez's benefit for over two months longer than his waiting period, which was 90 days. Because he wasn't receiving the $5 an hour either in cash or in insurance during that two-month period, he was receiving less than the Davis-Bacon Act entitled him to.

There is uncontradicted evidence that four other Horning workers had $5 per hour of work credited to the trust as well even though like Gonzalez they didn't participate in the benefits program and so never benefited from the $5 that was an ostensible part of their compensation—a part, I repeat, to which Davis-Bacon entitled them.

Horning's manager of human resources acknowledged that the $5 per hour subtracted from the workers' compensation was not based on an estimate of the benefits the worker would or might receive. She said that "Horning would put that money how they—you know, how they [the management] saw fit on that money. It wasn't just cash money in [the worker's] hand"—or, in the case of the five workers we've mentioned, money in their insurance accounts. No one in management attempted to match the $5 deductions to each employee's eligibility to receive benefits, even though as an experienced contractor on Davis-Bacon Act projects Horning's executives must have known about the statute's requirements. See *United States ex rel. Wall v. Circle C Construction, L.L.C.*, 697 F.3d 345, 356–57 (6th Cir. 2012). If they didn't know, it must have been because they closed their eyes to those requirements—a good example of ostrich behavior, itself a good example of deliberate indifference within the meaning of the False Claims Act.

A nontrivial part of the investment fund financed by the $5 wage deductions—at least $54,000—was diverted to the company's owner and to a relative of the general manager, neither of whom, so far as the record reveals, was entitled to receive money from the insurance fund. This is further evidence that Horning knowingly made false statements in claiming that the $5 of "fringe benefits" it took out of each worker's hourly salary went to "appropriate programs for the benefit of such employees," that is, by buying insurance for the employee. When "a defendant makes representations in submitting a claim but omits its violations of statutory, regulatory, or contractual requirements, those omissions can be a basis for liability if they render the defendant's representations misleading with respect to the goods or services

provided." *Universal Health Services, Inc. v. United States*, *supra*, 136 S. Ct. at 1999. That's this case.

To understand the full scope and gravity of Horning's conduct, we need to remand the case for a trial. We need to know how many employees were forced to contribute $5 of their compensation to a trust from which they could not benefit or how much less they received than they were entitled to. But we need to know even more. The company's principal defense is not that it never underpaid its workers, in violation of the Davis-Bacon Act, but that it had relied on its accountants to advise it with respect to its duty to pay its workers the minimum wage required by that Act, and that since it followed their advice it can't have knowingly violated the False Claims Act. But no evidence has been presented that the accountants in question had the necessary expertise, understood the Davis-Bacon Act (the source of Horning's duty to pay its workers the prevailing wage), actually advised Horning of the Act's requirements, or received full disclosure from Horning concerning the administration of the trust. There is also reason to believe that Horning didn't rely on the accountants' advice in good faith.

In short, it is premature to exonerate Horning.