# United States Court of Appeals
## For the First Circuit

Nos. 10-1609, 10-1610

PUERTO RICO TELEPHONE COMPANY, INC.,

Plaintiff-Appellant/Cross-Appellee,

v.

SPRINTCOM, INC.,

Defendant-Appellee/Cross-Appellant,

TELECOMMUNICATIONS REGULATORY BOARD OF PUERTO RICO;
SANDRA E. TORRES-LÓPEZ, in her official capacity as President
of the Telecommunications Regulatory Board of Puerto Rico;
GLORIA ESCUDERO-MORALES, in her official capacity as
Associate Member of the Telecommunications Regulatory Board
of Puerto Rico; NIXYVETTE SANTINI-HERNÁNDEZ, in her official
capacity as Associate Member of the Telecommunications
Regulatory Board of Puerto Rico,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., U.S. District Judge]

Before

Torruella, Siler,[*] and Howard,
Circuit Judges.

Scott H. Angstreich, with whom Jeffrey M. Harris and Kellogg,
Huber, Hansen, Todd, Evans & Figel, P.L.L.C., were on brief for
appellant/cross-appellee.
Miguel J. Rodríguez-Marxuach, with whom Alexandra Rodríguez-

[*] Of the Sixth Circuit, sitting by designation.

Díaz and <u>Rodríquez Marxuach, PSC</u>, were on brief for appellee/cross-appellant.

<u>Robert F. Reklaitis</u>, with whom <u>Leslie Paul Machado</u> and <u>Leclair Ryan</u>, were on brief for defendants/appellees.

---

November 9, 2011

---

**TORRUELLA, Circuit Judge.** This appeal arises out of disputes between plaintiff-appellant/cross-appellee Puerto Rico Telephone Company, Inc. ("PRTC") and defendant-appellee/cross-appellant SprintCom, Inc. ("Sprint") concerning the intercarrier compensation due under an interconnection agreement (the "Agreement"), which they entered into in June 2000. PRTC and Sprint both appeal from the district court's decision in P.R. Tel. Co., Inc. v. Telecommns. Regulatory Bd., 704 F. Supp. 2d 104 (D.P.R. 2009), where the court upheld an order of the Telecommunications Regulatory Board of Puerto Rico (the "Board") adjudicating the disputes at issue. On appeal, PRTC argues that the Board's order violated federal law and misinterpreted the Agreement insofar as it mandated that -- pursuant to the terms of the Agreement's change-of-law provision -- PRTC and Sprint were to reciprocally compensate each other for internet-service-provider-bound ("ISP-bound") traffic in accordance with the interim compensation regime set forth by the Federal Communications Commission ("FCC") in the ISP Remand Order.[1] Sprint, on the other hand, cross-appeals from the district court's decision upholding the Board's dismissal of Sprint's claims on a separate (albeit related) dispute in which Sprint alleged that PRTC had overcharged

---

[1] In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Intercarrier Compensation for ISP-Bound Traffic [hereinafter "ISP Remand Order"], 16 FCC Rcd. 9151, 2001 WL 455869 (2001), remanded by WorldCom, Inc. v. FCC, 288 F.3d 429 (D.C. Cir. 2002).

-3-

it for the termination of transit traffic. For the reasons stated below, we reverse in part and affirm in part the district court's decision and remand for further proceedings consistent with this opinion.

## I.  Regulatory Background

We provide some background of the regulatory framework under the Telecommunications Act of 1996 (the "1996 Act")[2] to set up the issues on appeal. Some of our prior cases provide further background as to the general operation of this statute. See, e.g., Centennial P.R. License Corp. v. Telecomms. Regulatory Bd., 634 F.3d 17 (1st Cir. 2011); Global NAPs, Inc. v. Verizon New Eng. Inc. ("GNAPs VI"), 603 F.3d 71 (1st Cir. 2010), cert. denied sub nom Gangi v. Verizon New Eng., Inc., 131 S. Ct. 1044 (2011); Global NAPs, Inc. v. Verizon New Eng., Inc. ("GNAPs V"), 505 F.3d 43 (1st Cir. 2007); Global NAPs, Inc. v. Verizon New Eng., Inc. ("GNAPs IV"), 489 F.3d 13 (1st Cir. 2007); Global NAPs, Inc v. Verizon New Eng., Inc. ("GNAPs III"), 444 F.3d 59 (1st Cir. 2006); Global NAPs, Inc. v. Mass. Dep't of Telecomm. & Energy, ("GNAPs II"), 427 F.3d 34 (1st Cir. 2005); Global NAPs, Inc. v. Verizon New Eng., Inc. ("GNAPs I"), 396 F.3d 16 (1st Cir. 2005).

Prior to the enactment of the 1996 Act, telephone services were provided mainly by incumbent local exchange carriers

---

[2]  Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996) (codified as amended in scattered sections of Title 47 of the United States Code).

("LECs") who operated as state-regulated monopolies. See Centennial P.R. License Corp., 634 F.3d at 21. In order to end the local telephone monopolies and promote competition, the 1996 Act, inter alia, removed all state barriers to entry, see 47 U.S.C. § 253, mandated that all telecommunications carriers interconnect with one another, see id. § 251(a)(1), and imposed special obligations on incumbent LECs to mitigate their dominant market position, including the duty to share their telecommunications facilities and services with their rivals (i.e., competing LECs), id. § 251(c)(2). See Centennial P.R. License Corp., 634 F.3d at 21.

"Interconnection[3] allows customers of one LEC to call the customers of another, with the calling party's LEC (the 'originating' carrier) transporting the call to the connection point, where the called party's LEC (the 'terminating' carrier) takes over and transports the call to its end point." Verizon Cal., Inc. v. Peevey, 462 F.3d 1142, 1146 (9th Cir. 2006). To ensure that each LEC is fairly compensated for these calls, the 1996 Act requires all LECs (both incumbent and competing) "to establish reciprocal compensation arrangements for the transport

---

[3]   Although the 1996 Act does not define the term "interconnection," the FCC has concluded that under 47 U.S.C. § 251(c)(2) the term refers to "the physical linking of two networks for the mutual exchange of traffic." In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996 [hereinafter "Local Competition Order"], 11 FCC Rcd. 15499, 15514 ¶ 26 (1996).

and termination of telecommunications." 47 U.S.C. § 251(b)(5); see also 47 C.F.R. § 51.703. Under a reciprocal compensation arrangement, "each of the two carriers receives compensation from the other carrier for the transport and termination on each carrier's network facilities of telecommunications traffic that originates on the network facilities of the other carrier." 47 C.F.R. § 51.701(e).

An assumption behind this reciprocal compensation system was that traffic back and forth on these interconnected networks would be relatively balanced such that no carrier would disproportionately benefit from the reciprocal payments. See GNAPs V, 505 F.3d at 45; ISP Remand Order, 16 FCC Rcd. at 9162 ¶ 20. The rise of "dial-up" internet access, however, disturbed this balance and created an opportunity for classic regulatory arbitrage.[4] See GNAPs V, 505 F.3d at 45; ISP Remand Order, 16 FCC Rcd. at 9162 ¶ 21. Specifically, because internet service providers ("ISPs") receive a high volume of calls and typically originate very few calls, some LECs began to heavily solicit ISPs as customers (e.g., by providing free services or even paying their

_____

[4] Regulatory arbitrage refers "to the practice of operating a business to take maximum advantage of the prevailing regulatory environment (as opposed to delivering the maximum amount of value to the business's customers), usually at the expense of consumers, competitors, or taxpayers, as the case may be." AT&T Communs. of Cal., Inc. v. Pac-West Telecomm, Inc., 651 F.3d 980, 984 n.4 (9th Cir. 2011).

ISP customers) so that such LECs would collect, instead of pay, reciprocal compensation. See GNAPs V, 505 F.3d at 45. This created a number of market distortions that hurt competition. ISP Remand Order, 16 FCC Rcd. at 9162 ¶ 21.

The FCC[5] first addressed the issue of reciprocal compensation over ISP-bound calls in February 1999, when it promulgated a short-lived ruling -- later vacated by the Court of Appeals for the District of Columbia Circuit -- that classified ISP-bound calls as non-local calls that did not qualify for reciprocal compensation under 47 U.S.C § 251(b)(5). In the Matter of Implementation of the Local Competition Provisions in the Telecommun. Act of 1996, 14 FCC Rcd. 3689 (1999) [hereinafter, "ISP Order No. 1"], vacated, Bell Atl. Tel. Cos. v. FCC, 206 F.3d 1 (D.C. Cir. 2000). The FCC said, however, that because "the [FCC] [had] no rule governing inter-carrier compensation for ISP-bound traffic, parties [could] voluntarily include this traffic within the scope of their interconnection agreements under sections 251 and 252 of the [1996] Act, even if these statutory provisions [did] not apply as a matter of law." ISP Order No. 1, 14 FCC Rcd. at 3702 ¶ 22. The FCC added that "pending adoption of [an FCC] rule establishing an appropriate interstate compensation mechanism," it

---

[5] "[T]he FCC, and not the individual state commissions, is the agency with the power granted by Congress to administer the [1996 Act], through the formulation of policy, rulemaking, and regulation." GNAPs III, 444 F.3d at 70 n.10 (quoting GNAPs I, 396 F.3d at 23 n.7).

-7-

had "no reason to interfere with state commission findings as to whether reciprocal compensation provisions of interconnection agreements apply to ISP-bound traffic." Id. at 3702 ¶ 21. The D.C. Circuit, however, vacated ISP Order No. 1 and remanded to the FCC, holding that the FCC had not satisfactorily explained its analysis for classifying ISP-bound calls. See Bell Atl. Tel. Cos. v. FCC, 206 F.3d at 9.

On remand, the FCC issued (in April 2001) the ISP Remand Order in which the FCC reexamined the grounds for its previous conclusion that 47 U.S.C. § 251(b)(5) did not mandate reciprocal compensation for ISP-bound traffic. See ISP Remand Order, 16 FCC Rcd. at 9164 ¶ 30. This time using a different reason,[6] the FCC again "conclude[d] that ISP-bound traffic was not subject to the reciprocal compensation provisions of section 251(b)(5)." Id. at 9167 ¶ 35. In addition, the FCC found that it had the authority under 47 U.S.C. § 201 to establish rules governing intercarrier compensation for ISP-bound traffic. Id. at 9175 ¶ 52. Pursuant to

---

[6]  In the ISP Remand Order, although the FCC stuck to its end-to-end analysis for classifying ISP-bound traffic as predominantly interstate in nature, see ISP Remand Order, 16 FCC Rcd. at 9175 ¶ 52, it backed off from its prior statement concerning the scope of 47 U.S.C. § 251(b)(5), see id. at 9167 ¶ 34. Specifically, the FCC admitted that it was incorrect to construe the reciprocal compensation provisions of 47 U.S.C. § 251(b)(5) as only limited to "local" traffic, given that "local" is not a term used in section 251(b)(5). Id. at 9167 ¶ 34. The FCC instead surmised that, because of the limitations imposed by section 251(g) on the scope of section 251(b)(5), ISP-bound traffic was not subject to the reciprocal compensation provisions of section 251(b)(5). Id. at 9167 ¶ 35.

this authority, the FCC stated that it would examine the desirability of adopting a uniform intercarrier compensation mechanism applicable to all traffic exchanged among telecommunications carriers, and, in that context, would examine the merits of a "bill and keep"[7] compensation regime for all traffic, including ISP-bound traffic. Id. at 9181 ¶ 66. The FCC, however, concluded that -- in order to address the then existing market distortions and avoid a "flash cut" to a new compensation regime -- an interim solution was necessary. Id. at 9186 ¶ 77. Thus, under the ISP Remand Order, the FCC imposed an interim intercarrier compensation regime for ISP-bound traffic (the "ISP Remand Order Compensation Regime") comprising a hybrid mechanism that included, inter alia, the following.

(1) Rate caps. The FCC imposed declining caps on intercarrier compensation rates for ISP-bound traffic, starting at $.0015 per minute-of-use ("mou") on the effective date of the ISP Remand Order and stabilizing, 36 months thereafter, at $.0007 per mou, id. at 9186-87 ¶¶ 77-78.

(2) Mirroring Rule. Because the FCC believed "[i]t would be unwise as a policy matter, and patently unfair" to have allowed incumbent LECs to benefit from lower rates for intercarrier

---

[7] Under a "bill and keep" regime, each carrier bills its own customers for its costs and keeps those payments as its compensation, with no compensation exchanged between the originating and terminating LECs. See ISP Remand Order, 16 FCC Rcd. at 9153 ¶ 2 n.6.

compensation of ISP-bound traffic (for which incumbent LECs were usually net-payors), while they benefitted from higher rates for traffic subject to reciprocal compensation under 47 U.S.C. § 251(b)(5) (for which incumbent LECs were generally net payees), the FCC imposed a special "mirroring" rule. Id. at 9193 ¶ 89. This rule established that "[t]he rate caps for ISP-bound traffic . . . adopt[ed] [by the FCC under the ISP Remand Order] apply . . . only if an incumbent LEC offers to exchange all traffic subject to section 251(b)(5) at the same rate." Id. However, "those incumbent LECs that choose not to offer to exchange section 251(b)(5) traffic subject to the same rate caps [adopted by the FCC] for ISP-bound traffic, [are ordered] to exchange ISP-bound traffic at the state-approved or state-arbitrated reciprocal compensation rates reflected in their contracts." Id. at 9194 ¶ 89. The ISP Remand Order allowed incumbent LECs to "make this election on a state-by-state basis." Id. at 9194 n.179. In sum, "the 'mirroring' rule ensures that incumbent LECs will pay the same rates for ISP-bound traffic that they receive for section 251(b)(5) traffic." Id. at 9194 ¶ 89. The FCC asserted that this was the correct policy result, since it saw no reason why there should be different rates for ISP-bound and voice traffic. Id. at 9194 ¶ 90.

This ISP Remand Order Compensation Regime became effective starting June 14, 2001. GNAPs II, 427 F.3d at 40. By its own terms, however, this regime does not apply in all

situations. Rather, to avoid upsetting contractual expectations, the ISP Remand Order establishes that the ISP Remand Order Compensation Regime applies "as carriers re-negotiate expired or expiring interconnection agreements" and "does not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions."[8]  ISP Remand Order, 16 FCC Rcd. at 9189 ¶ 82.

Similar to ISP Order No. 1, the ISP Remand Order was challenged before the D.C. Circuit, which again found the FCC's alleged basis to be lacking and rejected the FCC's reliance on 47 U.S.C. § 251(g).  WorldCom, Inc., 288 F.3d at 430.  This time, however, the D.C. Circuit decided not to vacate the FCC's order and instead remanded the case (in 2002) for the FCC to provide an alternative legal justification for the compensation rules adopted

---

[8]  Paragraph 82 of the ISP Remand Order, which governs the application of the ISP Remand Order Compensation Regime, establishes, in relevant part, as follows:

> The interim compensation regime we establish here applies as carriers renegotiate expired or expiring interconnection agreements. It does not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions. This Order does not preempt any state commission decision regarding compensation for ISP-bound traffic for the period prior to the effective date of the interim regime we adopt here. Because we now exercise our authority under [47 U.S.C. 201] to determine the appropriate intercarrier compensation for ISP-bound traffic, however, state commissions will no longer have authority to address this issue.

ISP Remand Order, 16 FCC Rcd. at 9189 ¶ 82.

under the ISP Remand Order.  Id.  Thus, the ISP Remand Order remained in force.

The FCC, however, delayed in responding to the D.C. Circuit's 2002 remand in WorldCom, Inc., causing the D.C. Circuit to grant a writ of mandamus ordering that the FCC respond to the 2002 remand "in the form of a final, appealable order that explains the legal authority for the Commission's interim intercarrier compensation rules that exclude ISP-bound traffic from the reciprocal compensation requirement of § 251(b)(5)."  In re Core Commc'ns, Inc., 531 F.3d 849, 861-62 (D.C. Cir. 2008).  The FCC complied in November 2008 by promulgating a new order addressing its authority to regulate ISP traffic.  See In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996, Developing a Unified Intercarrier Compensation Regime, Intercarrier Compensation for ISP-Bound Traffic [hereinafter, "Second ISP Remand Order"], 24 FCC Rcd. 6475 (2008).  In the Second ISP Remand Order, the FCC provided yet another basis for its authority to regulate ISP-bound traffic, namely, "that although ISP-bound traffic falls within the scope of section 251(b)(5), this interstate, interexchange traffic is to be afforded different treatment from other section 251(b)(5) traffic pursuant to [the FCC's] authority under section 201 and 251(i) of the [1996] Act."  Second ISP Remand Order, 24 FCC Rcd. at 6478 ¶ 6.  On review, the D.C. Circuit accepted the FCC's new legal

-12-

justification for the ISP Remand Order's interim compensation regime and affirmed. See Core Commc'ns, Inc. v. FCC, 592 F.3d 139, 141 (D.C. Cir. 2010).

## II. Facts and Procedural History

The material facts for the resolution of this case are not in dispute. Because this appeal involves two distinct (albeit related) disputes, we divide our discussion of the facts into two sections accordingly and generally discuss the facts relevant to each dispute separately.

## A. Dispute over whether the ISP Remand Order altered the Agreement

PRTC, a Puerto Rico corporation, is a telecommunications carrier and incumbent LEC under the jurisdiction of the Board and the FCC that provides local exchange, exchange access and intra-island long distance services in Puerto Rico. Sprint, a Kansas corporation authorized to do business in Puerto Rico, is a communications common carrier and telecommunications carrier providing commercial mobile services, commercial mobile radio services, personal communications services, and personal wireless services.

On June 26, 2000, PRTC and Sprint voluntarily negotiated and entered into the Agreement to establish the terms and conditions for interconnection of their networks. The Board approved this Agreement in accordance with 47 U.S.C. 252(e)(1). The Agreement had a one-year initial term, ending June 25, 2001.

-13-

The parties, however, agreed on multiple occasions to extend its terms beyond this date. Specifically, in June 2001, the parties extended the Agreement for another year. Subsequently, in June 2002, the parties extended it for a three-month term, to September 26, 2002. Then, in September 2002, PRTC and Sprint extended it indefinitely with automatic renewal every thirty days until written notice of termination by either party. The Agreement finally terminated on August 8, 2007. PRTC does not dispute that, during each of these extensions, it never offered Sprint the rate caps established under the ISP Remand Order. It is also undisputed that Sprint never specifically asked that PRTC make such an offer. Rather, the Agreement was extended each time under the same terms and conditions. Nevertheless, Sprint has never argued that the Agreement was ever an "expired or expiring agreement," within the meaning of the ISP Remand Order, during or prior to such Agreement extensions.

Effective July 19, 2002, PRTC entered into an interconnection agreement with a competitor -- known as Centennial -- in Puerto Rico, which contained rates for reciprocal compensation based on the rate caps established by the FCC under the ISP Remand Order. PRTC never notified other competitors of this. Nevertheless, on December 9, 2003, during negotiations between PRTC and AT&T Wireless (another competitor), the latter became aware that PRTC had offered the ISP Remand Order rate caps

-14-

to Centennial and requested that it also receive the same treatment. As a result of the negotiations, PRTC amended its interconnection agreement with AT&T Wireless in 2004, effective June 2003, to include rates for reciprocal compensation based on the ISP Remand Order's rate caps.

In August 2005, Sprint became aware that PRTC had offered the ISP Remand Order rate caps to competitors. Sprint, however, concedes that prior to August 2005 it neither asked PRTC nor reviewed PRTC's publicly filed interconnection agreements to ascertain this information.

Shortly thereafter in August 2005, Sprint informed PRTC of its belief that the ISP Remand Order triggered the change-of-law provision in the Agreement. In addition, Sprint requested that PRTC amend the then existing Agreement and that such amendment be effective as of the date PRTC first implemented the ISP Remand Order rate caps with another carrier (i.e., July 19, 2002). PRTC, however, rejected both Sprint's construction of the Agreement and its request for implementation of the ISP Remand Order rate caps as of July 19, 2002. PRTC thus continued to invoice Sprint based on the reciprocal compensation rates set forth in the Agreement's price schedule, which resulted in a composite reciprocal compensation rate of approximately $0.011 mou, which is much higher than the ISP Remand Order's rate caps.

-15-

After various discussions, matters escalated on March 21, 2007 when Sprint began to unilaterally adjust PRTC's charges for reciprocal compensation, transit traffic and reverse toll billing by applying the ISP Remand Order's capped rate of $0.0007. PRTC responded on May 10, 2007, warning that it would terminate services to Sprint unless Sprint paid the amounts withheld.

Thereafter, on May 21, 2007, Sprint filed a complaint with the Board that sought to enjoin PRTC from terminating services[9] and for a ruling that the ISP Remand Order triggered the Agreement's change-of-law provision as of the date PRTC began exchanging traffic with another competitor in Puerto Rico pursuant to the ISP Remand Order's rate caps (i.e., July 19, 2002), thus entitling Sprint to the application of the ISP Remand Order's rate caps as of such date. PRTC responded with a counterclaim seeking payment for reciprocal compensation at the rates set forth in the Agreement's price schedule.

The following timeline illustrates the relevant dates concerning PRTC and Sprint's dispute over the applicable intercarrier compensation rates for ISP-bound traffic.

(1) June 26, 2000. PRTC and Sprint enter into the Agreement, which has a one year initial term.

(2) April 2001. FCC issues the ISP Remand Order.

---

[9] The Board enjoined PRTC from terminating services to Sprint during the pendency of the dispute. That decision, however, is not before us in this appeal.

-16-

(3) June 14, 2001.  The ISP Remand Order Compensation Regime set forth in the ISP Remand Order becomes effective.

(4) June 25, 2001.  PRTC and Sprint extend the Agreement for one year.

(5) June 26, 2002.  PRTC and Sprint extend the Agreement for three months up to September 26, 2002.

(6) July 19, 2002.  PRTC offers the ISP Remand Order's rate caps to Centennial, a competitor of Sprint.

(7) September 27, 2002.  PRTC and Sprint extend the Agreement indefinitely with automatic renewal every thirty days until written notice of termination by either party.

(8) August 2005:  Sprint requests that PRTC amend the existing Agreement to incorporate the ISP Remand Order's rate caps and that such amendment be effective retroactively as of the date PRTC first implemented such rate caps with Centennial, i.e., as of July 19, 2002.

## B. Dispute over alleged excess billing for transit traffic

Sprint alleges that, during the discovery period in the aforementioned administrative proceeding, it became aware that PRTC's reciprocal compensation invoices for the period from December 2002 through July 2005 charged Sprint for transit traffic[10]

---

[10] Transit traffic occurs when a call is originated by a Sprint customer, routed (or "transited") through PRTC's network, and delivered to a third-party carrier, which is the carrier that provides service to the person Sprint's customer called. Such calls transit PRTC's network either because Sprint lacks a direct

services at rates that were in excess of the amounts established in the Agreement.

Thus, on January 2008, while discovery was ongoing, Sprint filed a motion with the Board for leave to amend its complaint to add a count seeking recoupment of amounts allegedly paid in excess to PRTC for transit traffic between December 2002 and July 2005. The Board granted the motion.

The parties dispute whether the information provided in PRTC's invoices was reasonably sufficient for Sprint to have identified the alleged over billing of transit traffic. Nevertheless, it is uncontested that Sprint did not object (in writing or otherwise) to the invoices in question within thirty days after PRTC mailed them and that Sprint paid the billed amounts to PRTC. In fact, the first time Sprint objected to the transit traffic charges in these invoices was in December 2007.

## C. Decisions of the Board and the District Court

The Board issued a resolution and order on February 19, 2009, after the parties had filed cross-motions for summary judgment.

---

connection with the network of the third-party carrier (both Sprint and the third-party carrier, however, are directly connected to PRTC's network), or because the direct connection between Sprint's network and the third-party carrier's network is full (in which case, the connection through PRTC's network serves as an "overflow" route).

-18-

Having found that the ISP Remand Order triggered the Agreement's change-of-law provision, the Board ruled in favor of Sprint on the ISP Remand Order issue and granted Sprint's claim for the application of the ISP Remand Order's rate caps as of July 19, 2002. The Board, however, closed the case without determining the amounts that Sprint allegedly overpaid to PRTC for reciprocal compensation and without ordering PRTC to credit Sprint for said amounts.

On the other hand, with respect to the transit traffic over billing dispute, the Board found, inter alia, that -- based on its reading of Section XIII.A. of the Agreement -- the Board was convinced "of the parties' intention to specifically limit objections to the invoices for thirty (30) days after a bill is mailed, a common practice in this type of agreement[]." The Board thus dismissed Sprint's claims against PRTC for alleged excess billing of transit traffic services.

PRTC challenged the Board's order on the ISP Remand Order issue by filing a complaint in the district court. Sprint responded by filing a cross-claim against the Board and a counter-claim against PRTC challenging the Board's dismissal of Sprint's claims against PRTC for the alleged over billing of transit traffic. After the parties filed cross-motions for summary judgment, the district court issued an opinion and order on March 18, 2010.

In its order, the district court held in favor of the Board and Sprint on the ISP Remand Order dispute, ruling that Sprint was entitled to the ISP Remand Order rate caps beginning on July 19, 2002, i.e, the date PRTC offered Centennial the ISP Remand Order rates. In addition, the district court granted Sprint's request that the case be remanded to the Board for a determination of the amounts due by PRTC to Sprint as a result of its decision. Also, with respect to Sprint's claims against PRTC on account of the latter's alleged over billing of transit traffic, the district court again agreed with the Board and dismissed Sprint's claims.[11] This appeal ensued.

### III.  **Appellate Jurisdiction**

Because federal courts must always be vigilant of their jurisdiction, we begin by analyzing whether we have subject matter jurisdiction over the underlying disputes.

A "district court has jurisdiction if 'the right of the petitioners to recover under their complaint will be sustained if the Constitution and laws of the United States are given one construction and will be defeated if they are given another,' unless the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is

---

[11] Specifically, the district court assumed, without deciding, that PRTC's invoices over billed Sprint for transit traffic services between December 2002 and July 2005 and agreed with the Board that Sprint had waived its right to dispute such invoices, pursuant to Section XIII.A. of the Agreement.

wholly insubstantial and frivolous.'" Verizon Md., Inc. v. Pub. Serv. Comm'n of Md. ["Verizon Md. I"], 535 U.S. 635, 643 (2002) (quoting Steel Co. v. Citizens for Better Env't, 523 U.S. 83, 89 (1998)).

There are two types of actions that fall under the rubric of federal question jurisdiction for purposes of 28 U.S.C. § 1331. "The first (and most familiar) category involves direct federal questions; that is, suits in which the plaintiff pleads a cause of action that has its roots in federal law (say, a claim premised on the United States Constitution or on a federal statute)." R.I. Fishermen's Alliance, Inc. v. R.I. Dep't of Envtl. Mgmt., 585 F.3d 42, 48 (1st Cir. 2009) (citing Am. Well Works Co. v. Layne & Bowler Co., 241 U.S. 257, 260 (1916) (Holmes, J.)). "The second (and far more rare) category involves embedded federal questions; that is, suits in which the plaintiff pleads a state-law cause of action, but that cause of action 'necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.'" Id. (alteration in original) (quoting Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg., 545 U.S. 308, 314 (2005)).

PRTC's complaint (filed in the district court) asserted two counts. The first count ("Count 1") alleged that the Board's order violated the ISP Remand Order, a federal ruling promulgated

under the 1996 Act, because it applied the ISP Remand Order Compensation Regime to a situation where the FCC did not intend for it to apply. The second count ("Count 2"), however, asserted a contract enforcement action alleging that the Board misinterpreted the Agreement insofar as it found that the ISP Remand Order triggered the Agreement's change-of-law provision, and consequently wrongfully applied the ISP Remand Order's provisions to the parties' dispute.

The parties (including the Board) unanimously aver that the district court had federal question jurisdiction over Count 1 under 28 U.S.C. § 1331 because this count asserts a violation of federal law, and had supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining claims, namely, (1) Count 2 of PRTC's complaint and (2) Sprint's claims for recoupment of amounts allegedly billed in excess by PRTC concerning transit traffic.[12] As explained below, we agree. Thus, we express no opinion as to whether federal question jurisdiction under 28 U.S.C. § 1331 is proper over Count 2, which arguably may be construed as a state law

_____

[12] All parties (including the Board) unanimously asserted that the district court had supplemental jurisdiction under 28 U.S.C. § 1367 over Count 2 of PRTC's complaint and Sprint's transit traffic over-billing claim. Unlike the Board, however, PRTC and Sprint also asserted that the district court had subject matter jurisdiction over Count 2 under both 28 U.S.C. § 1331 (federal question) and 47 U.S.C. § 252(e)(6).

-22-

contract enforcement action[13] with embedded questions of federal law concerning the application of the ISP Remand Order.[14] Similarly, we issue no opinion as to whether 47 U.S.C. § 252(e)(6) granted authority to the district court for reviewing the Board's interpretation and enforcement of the Agreement. Verizon Md. I, 535 U.S. at 642 (expressly declining to decide whether 47 U.S.C. § 252(e)(6) can be so construed).

Our decision that the district court had federal question jurisdiction over Count 1 is compelled by Verizon Md. I, where the Supreme Court held that federal courts have jurisdiction under 28

---

[13] See Global NAPs Cal., Inc. v. PUC of Cal., 624 F.3d 1225, 1228 (9th Cir. 2010) ("Although federal law requires LECs to execute interconnection agreements, the contracts themselves are creatures of state law." (citing Ill. Bell Tel. Co. v. Global NAPs Ill., Inc., 551 F.3d 587, 591 (7th Cir. 2008); Verizon Cal., Inc., 462 F.3d at 1152)).

[14] See R.I. Fishermen's Alliance, Inc., 585 F.3d at 48 (noting that federal question jurisdiction under 28 U.S.C. § 1331 is proper where "the plaintiff pleads a state-law cause of action, but that cause of action 'necessarily raise[s] a stated federal issue, actually disputed and substantial, which a federal forum may entertain without disturbing any congressionally approved balance of federal and state judicial responsibilities.'" (alteration in original) (quoting Grable & Sons Metal Prods., Inc., 545 U.S. at 314)); see also Verizon Md., Inc. v. Global Naps ["Verizon Md. II"], 377 F.3d 355, 366 (4th Cir. 2004) (concluding that although not "every dispute about a term in an interconnection agreement belongs in federal court," federal question jurisdiction is proper "when the contractual dispute... involves one of the 1996 Act's essential duties"); BellSouth Telecomms., Inc. v. MCImetro Access Transmission Serv., Inc., 317 F.3d 1270, 1278 (11th Cir. 2003) (en banc) (concluding that "the Georgia Public Service Commission had the authority to interpret and enforce the interconnection agreements that it had approved in the first instance and the federal district court had jurisdiction over th[e] case pursuant to 28 U.S.C. § 1331").

-23-

U.S.C. § 1331 over a claim alleging that a state commission's order, which mandated reciprocal compensation between two carriers in accordance with the terms of their interconnection agreement, violated the 1996 Act and a federal ruling. Verizon Md. I, 535 U.S. at 642.

Similar to Verizon Md. I, Count 1 avers a direct violation of federal law by alleging that the Board's order violated an FCC ruling, in this case the ISP Remand Order. As explained below, although it is unclear whether this claim ultimately has merit, we find that the district court properly exercised jurisdiction over it.

The ISP Remand Order expressly states that its interim compensation scheme "applies as carriers renegotiate expired or expiring agreements" and "does not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions." ISP Remand Order, 16 FCC Rcd. at 9189 ¶ 82 . Based on these provisions, it is clear that a failure to apply the ISP Remand Order Compensation Regime in situations where such regime applies by its own terms would violate federal law. It is not so clear, however, whether applying the ISP Remand Order Compensation Regime in other situations -- e.g., applying it to an existing interconnection agreement where the applicable contractual change-of-law provision is not triggered by the ISP Remand Order -- would constitute a violation of the ISP

-24-

Remand Order, as PRTC alleges, or only a breach of the existing interconnection agreement. Nevertheless, for jurisdictional purposes, the question is not whether PRTC's claim under Count 1 would ultimately succeed on the merits, but rather whether "the claim clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or [whether] such a claim is wholly insubstantial and frivolous." Verizon Md. I, 535 U.S. at 643 (internal quotations omitted). Because we find that PRTC's claim under Count 1 -- that the Board's order violates federal law -- was not "immaterial and made solely for the purpose of obtaining jurisdiction" or "wholly insubstantial and frivolous," we find that the district court had federal question jurisdiction over it. Id.

Having found that the district court had federal question jurisdiction over PRTC's claim in Count 1, we conclude that the district court had at least supplemental jurisdiction under 28 U.S.C. § 1367 over the remaining claims (i.e., Count 2 of PRTC's complaint and Sprint's transit traffic over billing claim). See GNAPs VI, 603 F.3d at 85 (finding that a defendant's counterclaim was more than sufficiently related to the plaintiff's complaint for purposes of supplemental jurisdiction where "[b]oth parties' claims ultimately [arose] from a dispute over the same agreement and involve[d] the same basic factual question: what fees the carriers owe[d] each other"). We have jurisdiction to hear this appeal under 28 U.S.C. § 1291.

-25-

Furthermore, although we find that the district court had federal question jurisdiction over PRTC's claim in Count 1, it is unnecessary for us to resolve on appeal the merits of this claim because, as explained below, we conclude that PRTC prevails on its claim under Count 2 and thus the district court's grant of summary judgment in favor of Sprint and the Board must be reversed insofar as it found that the ISP Remand Order triggered the Agreement's change-of-law provision. Accordingly, with respect to the dispute over the compensation rates for ISP-bound traffic, our analysis will focus on Count 2, which alleged that the Board misinterpreted the terms of the Agreement's change-of-law provision, and consequently wrongfully applied the ISP Remand Order Compensation Regime to the Agreement.

## IV. **Standard of Review**

"Where as here judicial review is based on the agency record, we apply to the agency ordinary review standards, accepting the district court decision merely as it may be persuasive." Centennial P.R. License Corp., 634 F.3d at 26.

Accordingly, we review de novo the Board's interpretations of federal and state law. Id. In addition, although it is customary where any doubt exists to give some deference to the agency charged with administering a statute, id., we give no deference to the Board's interpretation of the 1996 Act because it is the FCC -- and not the individual state commissions

-26-

-- that has the authority to administer the 1996 Act through the formulation of policy, rulemaking, and regulation. GNAPs III, 444 F.3d at 70 n.10 (quoting GNAPs I, 396 F.3d at 23 n.7). On the other hand, the Board's interpretation of an interconnection agreement that has been approved by it under the dual-regulation scheme adopted by the 1996 Act, see 47 U.S.C. 252(e)(1), is generally entitled to some deference. See GNAPs V, 505 F.3d at 47 (citing Boston Ed-ison Co. v. FERC, 441 F.3d 10, 12-13 (1st Cir. 2006)). Moreover, although we have not perfectly calibrated the weight to be accorded to such interpretation, we note that if such interpretation is reasonable then "at the very least close calls tend to go its way." Boston Edison Co., 441 F.3d at 13 (citing Sierra Club v. Larson, 2 F.3d 462, 468-69 (1st Cir. 1993)).

On the other hand, where no error of law exists, we review the state agency's other determinations under the arbitrary and capricious standard. Centennial P.R. License Corp., 634 F.3d at 27 (quoting GNAPs I, 396 F.3d at 24 n.8).

## V. Discussion

We turn now to the merits of this appeal, which involves two distinct disputes concerning intercarrier compensation under the Agreement, namely, (1) the dispute over whether the ISP Remand Order triggered the Agreement's change-of-law provision, and (2) the dispute over whether Sprint may recoup amounts allegedly

over billed by PRTC between December 2002 and July 2005 involving transit traffic.  We address these disputes in order.

**A.  <u>Dispute over whether the ISP Remand Order altered the Agreement</u>**

The Board concluded in its order that the <u>ISP Remand Order</u> triggered the Agreement's change-of-law provision and that, in accordance with the <u>ISP Remand Order</u>, the Agreement was "altered" at the moment PRTC offered the <u>ISP Remand Order</u>'s rate caps to Centennial.  For the reasons stated below, the Board's order misinterprets the Agreement and illustrates a misunderstanding as to the operation of the ISP Remand Order Compensation Regime (particularly, its mirroring rule). Accordingly, we reverse the district court's grant of summary judgment on this issue and remand for further proceedings.

As previously mentioned, the <u>ISP Remand Order</u> establishes that the ISP Remand Order Compensation Regime "applies as carriers renegotiate expired or expiring interconnection agreements" and "<u>does not alter existing contractual obligations</u>, except to the extent that parties are entitled to invoke contractual change-of-law provisions."  <u>ISP Remand Order</u>, 16 FCC Rcd. at 9189 ¶ 82 (emphasis added).  Thus, to avoid upsetting contractual expectations, the FCC expressly stated that the ISP Remand Order Compensation Regime did <u>not</u> apply to or alter interconnection agreements that existed as of the date such regime became effective (<u>i.e.</u>, June 14, 2001).  Rather, in the context of then existing

-28-

agreements, the ISP Remand Order Compensation Regime only applied if the respective parties had voluntarily agreed that their contract would incorporate such a change of law of voluntary application.

In the present case, Sprint has never alleged that the Agreement was an "expired or expiring agreement" at some point prior to August 2005 and consequently that the ISP Remand Order Compensation Regime applied to the parties prior to August 2005 as a matter of law. Neither did the Board address such a possibility in its order. Rather, the issue properly before us in this appeal is whether the ISP Remand Order Compensation Regime triggered the Agreement's change-of-law provision. The resolution of this question requires that we interpret the applicable terms of the Agreement.

All parties assert that Section I.E. of the Agreement sets forth the Agreement's change-of-law provision. This section establishes as follows:

> The parties agree that <u>if</u> 1) a regulatory agency or court having jurisdiction finds that the terms of this Agreement are inconsistent in one or more material respects with applicable federal or state law or any of its respective decisions, rules or regulations, or 2) <u>a regulatory agency</u> or court having jurisdiction <u>alters or preempts the effect of this Agreement</u>, <u>then</u> in the event of the occurrence of 1) or 2), which occurrence is final and no longer subject to administrative or judicial review, the <u>parties shall</u> immediately commence good faith negotiations to <u>conform this Agreement with any such</u>

decision, <u>rule</u>, regulation or preemption.  The <u>revised agreement shall have</u> an effective date that coincides with the <u>effective date of the original federal</u> or state <u>action</u> giving rise to such negotiations.  The parties agree that <u>except as provided herein the rates</u>, terms and conditions <u>of any new agreement shall not be applied retroactively to any period prior to such effective date</u>.

(Emphasis added).  Sprint alleged, and the Board found, that the <u>ISP Remand Order</u> triggered alternative "2" in the provision cited above.  No party has argued that the <u>ISP Remand Order</u> triggered alternative "1."  Thus, we also focus our analysis on alternative "2."

Section XXI of the Agreement establishes that the Agreement's construction, interpretation and performance shall be governed by and construed in accordance with the laws of the Commonwealth of Puerto Rico.  Accordingly, we are guided by the following principles for purposes of construing the Agreement's terms.

Articles 1233 through 1241 of the Puerto Rico Civil Code (the "Civil Code") govern contract interpretation under Puerto Rico law.  <u>See</u> P.R. Laws Ann. tit. 31, §§ 3471-3479.  As a basic rule of interpretation, Article 1233 establishes that "[i]f the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed."  P.R. Laws Ann. tit. 31, § 3471; <u>see also</u> <u>Unisys Puerto Rico, Inc.</u> v. <u>Ramallo Bros. Printing, Inc.</u>, 1991 WL 735351, 128

P.R. Dec. 842, 852 (1991) ("When the terms of a contract, its conditions and exclusions, are clear and specific, and leave no room for ambiguity or for diverse interpretations, they should be thus applied") (citations omitted). However, Article 1233 also establishes that if the contract language "should appear contrary to the evident intention of the contracting parties, the intention shall prevail." P.R. Laws Ann. tit. 31, § 3471; see also Marcial v. Tome, 1997 P.R.-Eng. 871,183, 144 P.R. Dec. 522, 536 (1997) (noting that although the Puerto Rico Supreme Court ordinarily "presupposes that the statements expressly set forth in the text of the contract constitute the will of the contracting parties" the Court will not hesitate to "thoroughly examine the true intent of the parties" whenever the Court has doubts as to such intent). Thus, determining the real and common intent of the contracting parties is the fundamental criteria for contract interpretation under Puerto Rico law. See Marcial, 1997 P.R.-Eng. 871,183, 144 P.R. Dec. at 537 ("Although the starting point of contract interpretation must be the expressions contained in the words, the trier cannot stop at the literal sense, but must fundamentally investigate the intent of the parties and the spirit and purpose of the transaction, as they are inferred from the overall conduct of the interested parties and from the concurring circumstances that may contribute to an adequate investigation of the will of the executing parties."). In determining "the intention of the

-31-

contracting parties, attention must principally be paid to their acts, contemporaneous and subsequent to the contract." P.R. Laws Ann. tit. 31, § 3472; see also Marcial, 1997 P.R.-Eng. 871,183, 144 P.R. Dec. at 537-38. In addition, "[i]n determining the intent of the contracting parties it is important to take into consideration who the contracting parties are, as well as their experience and expertise with the subject matter of the contract." Unisys Puerto Rico, Inc. v. Ramallo Bros. Printing, Inc., 1991 WL 735351 (P.R.), 128 D.P.R. 842, 853 (1991); see also P.R. Laws Ann. tit. 31, § 3471.

Our review of the Board's determination -- that the ISP Remand Order triggered the Agreement's change-of-law provision and that the application of such FCC ruling caused the Agreement's reciprocal compensation rates to be altered as of the date PRTC first offered said order's rate caps to a competitor -- requires the following analytical framework. First, it is necessary to determine whether the ISP Remand Order in fact triggered the Agreement's change-of-law provision. If we find that it did not, then that ends our inquiry and the Board's order cannot stand. On the other hand, if we were to find that the ISP Remand Order indeed triggered the Agreement's change-of-law provision, then we would turn to the second question, which would require that we determine the effect of applying the ISP Remand Order Compensation Regime to the Agreement (e.g., examining whether the Board correctly found

that the effect of applying the ISP Remand Order Compensation Regime to the Agreement was to alter the Agreement's reciprocal compensation rates as of the date PRTC offered the ISP Remand Order's rate caps to Centennial). As further explained below, our analysis of the first question indicates that the Board erred in finding that the ISP Remand Order triggered the Agreement's change-of-law provision. We therefore need not address the second question.

The Agreement's change-of-law provision established a general rule that all revisions made to the Agreement would be effective as of the date in which the Agreement was revised by the parties. See Section I.E. of Agreement ("The parties agree that except as provided herein the rates, terms and conditions of any new agreement shall not be applied retroactively to any period prior to [the] effective date [of the revised agreement]."). However, said provision established two specific exceptions to this general rule. If a change of law falls within one of these two exceptions, then the effective date of an Agreement revision -- that incorporates such a change of law -- shall coincide with the effective date of the federal or state action that caused the Agreement to be revised.

The exception at issue in this case is the second ("Exception Two"), which is triggered "if . . . a regulatory agency . . . alters or preempts the effect of th[e] Agreement."

(Emphasis added). A natural reading of this language indicates that it is only triggered where a regulatory agency itself as a matter of law alters or preempts the effect of the Agreement. Contrary to Sprint's arguments, it is unreasonable to construe this language as referring to a situation where PRTC and Sprint decide to alter the Agreement in light of a change of law (by a regulatory agency) whose application is voluntary. In such case, the regulatory agency would have changed the law, but it would not have "alter[ed] or preempt[ed] the effect of th[e] Agreement," as Exception Two expressly requires. Rather, assuming that PRTC and Sprint decide to voluntarily adopt such a change of law of voluntary application, it would be PRTC and Sprint who would "alter[] or preempt[] the effect of th[e] Agreement" and not the regulatory agency, as expressly required by Exception Two.

Furthermore, Sprint's unreasonably broad interpretation of Exception Two threatens to turn the exception into the general rule by causing practically all revisions made by the parties to the Agreement (incorporating a change of law) to have an effective date that coincides with the effective date of the federal action giving rise to the change of law. If Sprint intended this result, as it now avers, then the Agreement's change-of-law provision should have simply stated that Exception Two was triggered "if a regulatory agency changes the law, regardless of whether it alters or preempts the effect of the Agreement." The clear language of

the Agreement that was actually entered into by Sprint and PRTC, however, does not support such interpretation.

Thus, the terms of the Agreement's change-of-law provision are clear and leave no doubt as to the parties' intentions that only those changes of law which by their own force alter or preempt the effect of the Agreement will trigger Exception Two. We therefore disagree with the district court's finding to the contrary.

The ISP Remand Order Compensation Regime, however, was not the type of change of law that altered or preempted -- by its own force -- PRTC and Sprint's Agreement. To the contrary, the FCC made expressly clear that this interim compensation regime "does not alter existing contractual obligations, except to the extent that parties are entitled to invoke contractual change-of-law provisions." ISP Remand Order, 16 FCC Rcd. at 9189 ¶ 82 (emphasis added). Thus, the ISP Remand Order Compensation Regime only altered interconnection agreements -- which existed at the time such regime became effective -- if the contracting parties had voluntarily agreed that their agreements would be thus altered.

As previously mentioned, however, the Agreement's change-of-law provision clearly expressed the parties' common intention that Exception Two would not be triggered by a change of law that did not by its own force alter or preempt the Agreement and whose application to the Agreement was subject to the parties' common

-35-

intent. It is therefore necessary to conclude that the ISP Remand Order Compensation Regime did not trigger Exception Two of the Agreement's change-of-law provision. As a result, the ISP Remand Order Compensation Regime applied to PRTC and Sprint as they re-negotiated intercarrier compensation for a revised agreement and not prior to such time.

The Board found, however, that the language of the Agreement's Section III.A.2. ("Section III.A.2."), which governed the intercarrier compensation for ISP-bound traffic under the Agreement, provided further support for its conclusion that the ISP Remand Order triggered alternative "2" of the Agreement's change-of-law provision. This section states as follows:

> Until the FCC establishes a means of determining the amount of intercarrier compensation for ISP-bound traffic, compensation for such traffic shall be based upon a division of revenues as follows: compensation for traffic delivered to an ISP shall be paid by the carrier whose customer originates the call in the amount of 50% of the amount billed by the originating carrier. Any amount billed by the terminating carrier to the ISP for delivery of such traffic shall be credited against such payments by the originating carrier and the net amount remaining shall be paid by the originating carrier.

In construing the import of this language, the Board opined as follows: "Said language leads us to conclude the parties were aware and in anticipation of a forthcoming FCC action that could alter the rates adopted in the [Agreement]." We more or less

agree with this general proposition, given that, as the aforementioned regulatory background illustrates, the Agreement was signed on a date (i.e., June 26, 2000) when the FCC was reconsidering on remand its ruling in the ISP Order No. 1.  Thus, it is expected for PRTC and Sprint to have anticipated a forthcoming FCC action that could change the law in this area. We, however, do not agree with the analytical leap made by the Board. That is, we do not agree with the Board's apparent proposition that the parties' anticipation of an FCC action in this area necessarily entails that PRTC and Sprint agreed for any FCC action to have altered their Agreement effective as of the date of the FCC's action, and not as of the date in which such a change of law was incorporated by the parties into a revised agreement.

Significantly, Section III.A.2. is silent with respect to whether an FCC action in this area would necessarily alter the Agreement and, more importantly, the effective date for such purported alteration.  Nowhere does Section III.A.2. say that an FCC action such as the ISP Remand Order -- which did not by its own force alter or preempt the then existing Agreement -- would necessarily alter the Agreement as of the date of the FCC's action. Rather, Section III.A.2. merely appears to open up the possibility for negotiation on the issue of compensation for ISP-bound traffic by establishing a conditional intercarrier compensation scheme that would apply until the FCC established a means of determining

-37-

intercarrier compensation for ISP-bound traffic.  These matters, however, are expressly covered by the Agreement's change-of-law provision, which established that -- except for changes of law that by their own force alter or preempt the Agreement -- no changes of law would be applied by PRTC and Sprint effective as of a date prior to the date in which they consented to a revised agreement implementing such changes of law.  Thus, Section III.A.2. does not support the Board's determination that the ISP Remand Order Compensation Regime triggered Exception Two of the Agreement's change-of-law provision.[15]

Notably, the Board's lead argument in this appeal was not based on the grounds upon which its order rested (i.e., that the ISP Remand Order Compensation Regime triggered the Agreement's change-of-law provision).[16]  Rather, on appeal the Board argues for

---

[15]  It could have been argued that a possible interpretation of the Agreement's text is to construe Section III.A.2. as a conditional obligation that worked in the alternative by first mandating compensation under the terms set forth therein and then, after the FCC's action, implicitly mandating compensation under the compensation scheme established by the FCC.  Notably, under this construction, the ISP Remand Order Compensation Regime would have applied to the Agreement by operation of Section III.A.2. alone without the need to alter the terms of the Agreement. Nevertheless, no party in this case has advanced this interpretation of Section III.A.2. and we are hesitant to consider an interpretation of the Agreement that was not advanced by any party, all of which have argued that the Agreement's terms required alteration for the ISP Remand Order Compensation Regime to be implemented.  Thus, we do not consider the merits of this possible argument here.

[16]  The argument that the ISP Remand Order Compensation Regime triggered alternative "2" in the Agreement's change-of-law

-38-

the first time that PRTC should have offered the ISP Remand Order Compensation Regime's rate caps in 2002 when PRTC and Sprint agreed to multiple extensions of the Agreement, all of which were approved by the Board pursuant to 47 U.S.C. § 252(e)(1).  The Board thus apparently suggests that the Agreement was an "expired or expiring agreement" -- within the meaning of the ISP Remand Order -- at the time that PRTC and Sprint negotiated the extensions of the Agreement in 2002, and consequently that the ISP Remand Order Compensation Regime applied to such negotiations as a matter of law.  See ISP Remand Order, 16 FCC Rcd. at 9189 ¶ 82 (establishing that the ISP Remand Order Compensation Regime "applies as carriers renegotiate expired or expiring interconnection agreements").  We note that Sprint has never made this argument, the Board's order did not rest on this ground or even address it, and the record is not developed on this issue.  Thus, we decline to consider this new argument for purposes of this appeal.  Moreover, the Board cannot now defend its order based on this new argument, which leads to a different result in terms of the date as of which the ISP Remand Order Compensation Regime may have applied to PRTC and Sprint. Thus, the Board's order on this dispute cannot stand and we remand this case.  We clarify, however, that we express no opinion as to the merits of this new argument now brought by the Board. Similarly, we issue no opinion as to whether Sprint is precluded

provision was presented by the Board in the alternative.

(through estoppel or otherwise) from claiming on remand that the ISP Remand Order Compensation Regime applied as a matter of law at the various times in which the Agreement was extended by PRTC and Sprint after June 14, 2001 (i.e., the ISP Remand Order Compensation Regime's effective date) because the Agreement was considered at such times an "expired or expiring agreement" within the meaning of the ISP Remand Order.

In sum, we conclude that the Board erred in finding that the "ISP Remand Order triggered the [Agreement's] change of law provision from the time PRTC opted to terminate that traffic with another carrier at the rates adopted in the Order."[17] We therefore

_____

[17] We find it useful to clarify that, even if the Board had been correct in finding that the ISP Remand Order Compensation Regime triggered Exception Two of the Agreement's change-of-law provision, the Board nevertheless erred in finding that the Agreement was first altered on July 19, 2002 when PRTC offered the FCC rate caps to another carrier, namely, Centennial. Such a determination ignored the application of the mirroring rule during the period from June 14, 2001 (when the ISP Remand Order Compensation Regime became effective) through July 18, 2002. As previously mentioned, the mirroring rule "ensures that incumbent LECs will pay the same rates for ISP-bound traffic that they receive for section 251(b)(5) traffic." Id. at 9194 ¶ 89. Thus, because the Agreement established different rates for the reciprocal compensation of section 251(b)(5) traffic (e.g., voice traffic) as compared to the rates for intercarrier compensation of ISP-bound traffic, a determination that the ISP Remand Order Compensation Regime triggered the Agreement's change-of-law provision would have altered the Agreement such that at least these rates were made equal as of the date the ISP Remand Order Compensation Regime became effective (i.e., June 14, 2001), even if PRTC opted not to offer the FCC's rate caps as of such date and the parties paid reciprocal compensation at the rates set forth in the Agreement's price schedule. Thus, if the Board had been correct in finding that the ISP Remand Order Compensation Regime triggered the Agreement's change-of-law provision, the Agreement would have been

-40-

reverse the district court's grant of summary judgment on this issue and remand the case to the district court with instructions that the court grant injunctive relief precluding the enforcement of the Board's order on this issue and that the case then be remanded to the Board for further proceedings consistent with this opinion.

## B. **Dispute over alleged excess billing for transit traffic**

This appeal also presents a dispute between PRTC and Sprint as to whether PRTC's reciprocal compensation invoices for the period from December 2002 through July 2005 billed Sprint for transit traffic services at rates that were in excess of the amounts established in the Agreement, and whether Sprint may recover such amounts. The Board found and the district court agreed that, even if PRTC over billed Sprint for transit traffic, Sprint waived its right to challenge PRTC's invoices, pursuant to Section XIII.A. of the Agreement (the "Waiver Provision"). Sprint challenges this determination on appeal through various arguments. For the reasons stated below, we agree with the Board's determination and affirm the district court's grant of summary judgment dismissing Sprint's claims for the recoupment of amounts allegedly over billed by PRTC concerning transit traffic.

first altered effective June 14, 2001 to comport with the mirroring rule.

Section III.B.4. of the Agreement establishes that the parties must reciprocally compensate each other for transit traffic services in accordance with Section III.A., which in turn makes reference to a price schedule attached to the Agreement. On the other hand, Section XIII.A. of the Agreement, which governs the payment of charges billed under the Agreement, requires that any objection to reciprocal compensation charges must be made in writing and received by the billing party within thirty days from the date the billing party mailed the corresponding invoice. Specifically, the Waiver Provision establishes as follows:

> Each party is responsible for payment of all charges for completed calls, services and equipment chargeable to that party under the terms hereof. If objection in writing is not received by the billing party within (30) days after a bill is mailed, the account shall be deemed correct and binding upon the billed entity.

Thus, under the Waiver Provision, a billed party's failure to object to the billing party's invoice within thirty days will cause the invoice to be "deemed correct" and be "binding upon the billed party." Although the Agreement does not define the words "deem" and "binding," these words are of common legal usage and are defined in legal dictionaries. For example, Black's Law Dictionary defines the word "deem" as follows: "To treat (something) as if (1) it were really something else, or (2) it has qualities that it does not have." Black's Law Dictionary 477-78 (9th ed. 2009) (noting that the word "deem" "has been traditionally

-42-

considered to be a useful word when it is necessary to establish a legal fiction either positively by 'deeming' something to be what it is not or negatively by 'deeming' something not to be what it is" (quoting G.C. Thornton, Legislative Drafting 99 (4th ed. 1996))). Moreover, the word "binding" has been defined as "having legal force." Black's Law Dictionary 190 (9th ed. 2009). Thus, the text of the Waiver Provision clearly manifests PRTC and Sprint's common intentions that a billed party's failure to object in writing to an invoice during the specified time shall cause the invoice (1) to be treated by the parties as if it were correct, even if it was not, and (2) to have legal force between the parties. Accordingly, under the terms of the Waiver Provision, a billed party's failure to object to an invoice in accordance with the procedures set forth in such provision constitutes a waiver of that party's right to challenge the invoice.

Sprint, however, alleges that the Waiver Provision is ambiguous because it conflicts with other provisions of the Agreement, namely, the first sentence of Section XIII.A. and Section XVII. As explained below, these arguments are unavailing.

The first sentence of Section XIII.A. states that "[e]ach party is responsible for payment of all charges for completed calls, services and equipment chargeable to that party under the terms hereof." (Emphasis added). Sprint contends that the Waiver Provision only applies insofar as the charges on an invoice are

"chargeable" under the terms of the Agreement, and because PRTC's invoices for transit traffic were not, Sprint maintains that it has not waived its right to challenge them. In other words, Sprint argues that the Waiver Provision only applies insofar as the invoice is correct. This argument is without merit and renders the Waiver Provision a nullity. As previously mentioned, the Waiver Provision's use of the term "deem" clearly suggests that the provision is specifically intended to apply in cases where the billed amounts were not properly chargeable under the terms of the Agreement. Furthermore, interpreting the Waiver Provision as only restricting the right of a billed party to challenge a correct and properly chargeable invoice, as Sprint suggests, would render such provision practically meaningless. We thus decline to adopt such interpretation. See P.R. Laws Ann. tit. 31, § 3474 ("If any stipulation of a contract should admit of different meanings, it should be understood in the sense most suitable to give it effect.").

In addition, Sprint argues that the Waiver Provision is trumped or at least made ambiguous by the Agreement's Section XVII (the "General Anti-Waiver Provision"), which is titled "No Waiver" and establishes that "[a] failure or delay of either Party to enforce any provision of this Agreement, to exercise any option that is herein provided, or to require the performance of any provision hereof shall in no way be construed to be a waiver of

-44-

such provision or option." This argument also misses the mark. It is a well-known precept for the interpretation of contracts that specific provisions in a contract trump the general provisions. Moreover, interpreting the General Anti-Waiver Provision as negating the Waiver Provision, as Sprint suggests, would completely nullify the latter. The same is not true, however, if we interpret the Waiver Provision -- which expressly only applies in the context of objections to billed charges -- as controlling over the General Anti-Waiver Provision, which would still have applicability in other contexts and would not be nullified. We therefore choose the interpretation that gives effect to both of these provisions and construe the Waiver Provision as controlling over the General Anti-Waiver Provision. See P.R. Laws Ann. tit. 31, § 3474. Sprint's argument thus fails.

Sprint's next argument is that it could not have waived its right to challenge PRTC's invoices under the Waiver Provision because PRTC's invoices did not provide sufficient information for Sprint to have properly audited them. In essence, Sprint maintains that, under the terms of the Agreement, the Waiver Provision's thirty-day term for raising billing disputes is tolled until the billing party provides sufficient information that would enable the billed party to detect any errors in the billing. Sprint's contention, however, has no basis in the Agreement, which included no such exception to the operation of the Waiver Provision.

Furthermore, Sprint points us to no evidence suggesting that the parties commonly intended to include such an exception in the Waiver Provision. Accordingly, we decline to read such an exception into the Waiver Provision and conclude that Sprint's argument is without merit. It is undisputed that Sprint was aware of its obligation under the Agreement to compensate PRTC for the latter's services involving transit traffic and that PRTC's invoices charged Sprint for such services. If Sprint found that the information provided in PRTC's invoices was insufficient for a proper audit within the period specified by the Waiver Provision, then Sprint was required under the terms of the Agreement to have objected to such invoices during such period.

Sprint next avers that applying the Waiver Provision in the present case -- to the effect that PRTC is relieved from returning excess transit traffic charges -- would constitute a violation of (1) the unjust enrichment doctrine and (2) Article 1795 of the Civil Code, P.R. Laws Ann. tit. 31, § 5121, which establishes that "[i]f a thing is received when there was no right to claim it and which, through an error, has been unduly delivered, there arises an obligation to restore the same." This argument does not hold water.

First, it is well-settled under Puerto Rico law that the undue enrichment doctrine is not applicable where, as here, there is a legal precept (e.g., a binding agreement) that excludes the

-46-

application of such doctrine.  See  Hatton v. Municipality of Ponce, 1994 P.R.-Eng. 909,605, 134 P.R. Dec. 1001, 1010 (1994) (noting that the requirements for the application of the unjust enrichment doctrine are as follows: "1) existence of enrichment; 2) a correlative loss; 3) nexus between loss and enrichment; 4) lack of cause for enrichment; and 5) absence of a legal precept excluding application of enrichment without cause") (emphasis added) (citing Ortiz-Andujar v. Commonwealth, 22 P.R. Offic. Trans. 774, 122 P.R. Dec. 817, 823 (1988)).  Thus, under Puerto Rico law, the doctrine of unjust enrichment does not apply where, as here, there is a contract that governs the dispute at issue.  See Westernbank Puerto Rico v. Kachkar, No. 07-1606, 2009 U.S. Dist. LEXIS 126405, at *100, 2009 WL 6337949, at *29 (D.P.R. Dec. 10, 2009) (quoting Garriga, Hijo, Inc. v. Condominio Marbella del Caribe, 143 P.R. Dec. 927, 934 (1997)).  Sprint agreed that any charges billed by PRTC pursuant to the Agreement and not objected to within thirty days would be treated as if they were correct and would bind the parties.  Sprint cannot now evade compliance with such pact by raising inapplicable equitable principles.

Second, Sprint's allegation that the Board's order violated Article 1795 of the Civil Code similarly fails.  See P.R. Laws Ann. tit. 31, § 5121 ("Restitution of thing improperly received").  Notably, Article 1795 is included within a chapter of the Civil Code titled "Quasi Contracts".  See P.R. Laws Ann.

-47-

tit. 31, §§ 5091-5127.  This chapter is in turn included within Part XVI, which is titled "Obligations Contracted Without Agreement."  See P.R. Laws Ann. tit. 31, §§ 5091-5150 (emphasis added).  It is clear that, similar to the unjust enrichment doctrine, Article 1795 of the Civil Code does not apply where, as here, there is a valid and binding agreement between the parties that governs the dispute at issue and mandates a specific result, i.e., that the invoices in question, which were belatedly challenged by Sprint under the Waiver Provision, are deemed correct and binding between PRTC and Sprint.  Sprint's proposed expansive interpretation of Article 1795 would essentially nullify any contractual provision whereby a party waives the right to recover amounts paid in excess under an agreement.  Sprint cites to no authority supporting such an outlandish interpretation of Article 1795 and we decline to adopt it here.

Finally, Sprint contends that the district court erred by ignoring Sprint's allegations that PRTC acted in bad faith when it overcharged Sprint for transit traffic.  Moreover, Sprint alleges that there was sufficient evidence in the record to support a finding that such alleged bad faith actions by PRTC constituted dolo (or "dolus") under the Civil Code and thus that PRTC is liable for all damages that may clearly originate from its actions, pursuant to Article 1060 of the Civil Code.  See P.R. Laws Ann. tit. 31, § 3024.  Specifically, Sprint maintains that PRTC engaged

-48-

in bad faith by purposely over billing for transit traffic and then concealing its actions. For the reasons stated below, we find that these arguments are waived.

First, Sprint avers that its allegations of bad faith by PRTC should have lead the district court to modify the terms of the Agreement (particularly, the Waiver Provision) to avoid an unequitable result, i.e., PRTC benefitting from its alleged bad faith over billing. Thus, Sprint now urges that we intervene in the contractual relationship and modify the terms of the Agreement. In support, Sprint cites, inter alia, Utility Consulting Services, Inc. v. Municipality of San Juan, 15 P.R. Offic. Trans. 120, 115 P.R. Dec. 88, 89-90 (1984), in which the Puerto Rico Supreme Court exercised its power to revise an agreement where there was an exorbitant lack of proportion in the reciprocal obligations between the parties and the provisions were found to be so excessively burdensome on the Municipality that they "reache[d] bad faith proportions."

As an initial matter, we note that Utility Consulting is not directly on point here, as that case dealt with bad faith at the contracting stage (which resulted in excessively burdensome contract terms) and the present case deals with alleged bad faith during the performance of a contract whose terms are not on their face excessively burdensome. Nevertheless, assuming arguendo that the general principles of Utility Consulting and the other cases

-49-

cited by Sprint on this issue can somehow be construed as giving Sprint a plausible argument for the modification of the Waiver Provision, we do not consider the argument here because it has been waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990). Although Sprint did assert before the Board and the district court that PRTC's over billing for transit traffic was done in bad faith, Sprint never argued that the adjudicator should have exercised its alleged power to modify the Waiver Provision. A party is ordinarily not entitled to wait until an appeal, after its arguments have failed, to spring newly-minted arguments based on undeveloped references left in the record below. See McCoy v. Mass. Inst. of Tech., 950 F.2d 13, 22 (1st Cir. 1991) ("If claims are merely insinuated rather than actually articulated in the trial court, we will ordinarily refuse to deem them preserved for appellate review."). We see no reason to diverge from this rule here and decline to consider Sprint's new argument for the modification of the Agreement.

Second, Sprint maintains that PRTC's alleged bad faith over billing of transit traffic constituted dolo (or "dolus") under the Civil Code and that PRTC should be liable for all damages that may originate from such bad faith performance of the Agreement, pursuant to Article 1060 of the Civil Code. See P.R. Laws Ann. tit. 31, § 3024 (establishing that a party who engages in dolo in the performance of an obligation "shall be liable for all those

[damages] which clearly may originate from the nonfulfillment of the obligation"). The Board and PRTC, however, contend that any argument premised on an allegation of dolo is waived because Sprint did not allege below that PRTC incurred in dolo. Sprint counters by arguing that its allegations of bad faith before the Board and the district were essentially allegations of dolo. As explained below, although we agree with Sprint that its allegations of bad faith may be construed as allegations of dolo, we nevertheless find that its undeveloped dolo argument is waived.

The Puerto Rico Supreme Court has recognized that contractual dolo is a broad term that "includes deceit, fraud, misrepresentation, undue influence" and other insidious machinations. Márquez v. Torres Campos, 11 P.R. Offic. Trans. 1085, 111 P.R. Dec. 854, 863-64 (1982). For example, although there may be dolo without fraud, fraud always entails dolo. In addition, Puerto Rico law distinguishes between contractual dolo occurring at the contracting stage (i.e., during the formation of the contract) and contractual dolo occurring in the course of the performance of the contract. See Colón v. Promo Motor Imps., Inc., 144 P.R. Dec. 659, 668 (1997) (official translation). Contractual dolo that occurs during the formation of the contract, if deemed serious, may give rise to the nullification of the contract. Id. On the other hand, "contractual [dolo] that arises not at the contracting stage, but in the course of the performance of the

contract," such as the one here alleged by Sprint, does not give rise to the nullification of the contract. Colón, 144 P.R. Dec. at 668; see also Márquez, 11 P.R. Offic. Trans 1085, 111 P.R. Dec. at 863-64. Rather, in such cases, Article 1060 of the Civil Code establishes that the party who engages in dolo is liable for all damages "which clearly may originate from the nonfulfillment of the obligation." P.R. Laws Ann. tit. 31, § 3024. This imposition of damages (for a dolo-type performance of a contract) is broader than that resulting from a good faith breach of contract, where, in contrast, damages are limited to "those foreseen or which may have been foreseen, at the time of constituting the obligation, and which may be a necessary consequence of its nonfulfillment." Id. Notably, the Puerto Rico Supreme Court has stated that dolo "in the performance of obligations is equalized to bad faith." Canales v. Pan Am., 12 P.R. Offic. Trans. 411, 112 P.R. Dec. 329, 340 (1982).

Based on the foregoing, it is reasonable to construe Sprint's allegations that PRTC performed the Agreement in bad faith as an assertion of dolo. Id., 12 P.R. Offic. Trans. 411, 112 P.R. Dec. at 340. Nevertheless, Sprint's dolo argument is waived because, even on appeal, Sprint has made no attempt at developed argumentation. See Zannino, 895 F.2d at 17 (memorializing "settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"). Sprint limits its discussion here to asserting that PRTC

engaged in dolo while billing for transit traffic, and thus that PRTC is liable for all damages resulting from such nonfulfillment. However, Sprint has made no attempt (neither before the Board, the district court nor on appeal) to reconcile this assertion with the Waiver Provision, under which Sprint waived its right to challenge the invoices in question. Neither the district court nor this Court should be expected to make the argument for Sprint. The argument is therefore waived.

Notably, Sprint has never argued that, pursuant to Article 1055 of the Civil Code, the Waiver Provision must be interpreted as only a waiver of liability arising from a good-faith breach of the Agreement and not as a waiver of liability resulting from a dolo-type performance of the Agreement. P.R. Laws Ann. tit. 31, § 3019 ("Liability arising from [dolo] is demandable in all obligations. The renunciation of the action to enforce it is void."). Such argument may have been promising. See Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 961 F. Supp. 353, 358 (D.P.R. 1997) ("Article 1055 is aimed . . . at prohibiting the parties to include in a contract an 'exclusionary clause' to release before hand the future intentional and dolus breach of their obligations under said contract."). However, because Sprint has never raised it and it has not been argued by the parties, we do not consider it at this juncture.

Based on the above, we affirm the district court's grant of summary judgment in favor of the Board and PRTC regarding Sprint's claims for the recoupment of transit traffic charges allegedly over billed by PRTC.

## VI. Conclusion

Because we conclude that the Board erred in finding that the ISP Remand Order Compensation Regime triggered the Agreement's change-of-law provision, we <u>reverse</u> the district court's grant of summary judgment on this issue. Accordingly, we <u>remand</u> the case to the district court with instructions that the court grant injunctive relief precluding the enforcement of the Board's order on this issue and that the case then be <u>remanded</u> to the Board for further proceedings consistent with this opinion. In addition, we <u>affirm</u> the district court's grant of summary judgment in favor of the Board and PRTC regarding Sprint's claims for the recoupment of transit traffic charges allegedly billed in excess by PRTC. No costs are awarded.

**<u>So ordered</u>**.